517 F.2d 214
 17 UCC Rep.Serv. 693
 SPARTAN GRAIN & MILL COMPANY, Plaintiff-Appellee-Cross-Appellant,
v.
Virgil AYERS, W. C. Meaders, Jr., and Boyce Blackmon,
Defendants-Appellants-Cross-Appellees.
 No. 74-3134.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 8, 1975.
 
 Jerre B. Swann, Atlanta, Ga., William O. Carter, Hartwell, Ga., for defendants-appellants-cross-appellees.
 James M. Landis, John C. Butters, Atlanta, Ga., J. Vincent Cook, Athens, Ga., for plaintiff-appellee-cross-appellant.
 Appeals from the United States District Court for the Middle District of Georgia.
 Before COLEMAN, MORGAN and CLARK, Circuit Judges.
 LEWIS R. MORGAN, Circuit Judge:
 
 
 1
 Spartan Grain and Mill Co. ("Spartan") filed suit in November, 1972, seeking to recover the unpaid balances owed by three defendants-appellants ("producers") for chicken feed purchased from Spartan. At the conclusion of the trial, the district judge directed a verdict in favor of Spartan on four issues; the producers, choosing not to put all their eggs in one basket, appeal all these rulings. On the one issue which the judge allowed the jury to decide, it returned verdicts in favor of the producers; Spartan cross appeals, challenging the trial court's denial of its motions for directed verdict and for judgment notwithstanding the verdict. As explained below, we find merit in two of producers' contentions and reject all other claims of error, including the cross appeal.
 
 I.
 
 2
 The transactions giving rise to this suit were a series of contracts, each specifying that in return for the individual producer's promise to use only Spartan feed in raising a flock of chickens, Spartan would, subject to certain conditions, purchase all the eggs produced by the flock and arrange for them to be hatched. The first issue on appeal concerns the price Spartan charged for its feed; producers contend that although the product was chicken feed, the price was not. Since the contracts did not specify a price for the feed, Ga.Code § 109A-2-305(1)[1] required that the price be a "reasonable" one; consequently the producers attempted by various methods to show that Spartan had breached the agreement by charging an unreasonably high price.
 
 
 3
 Producers first attempted to show that there were other feeds on the market selling at much lower prices, but the district judge ruled the offered evidence inadmissible. Producers offered to compare the prices charged by Spartan with those of a Georgia cooperative and those of the Ralston Purina Co. Neither of these associations offered a similar marketing program, however, and the cooperative did not even attempt to profit by its feed sales. Producers then attempted to compare Spartan's prices to those of Marbut Milling Co. Although Marbut did for a time offer services similar to Spartan's, it only finalized three such contracts, and the court refused to permit the comparison.
 
 
 4
 The district judge was correct in ruling that the prices charged by these other sellers could not validly be compared to those charged by Spartan. Spartan's prices were not necessarily unreasonable simply because they were higher than those charged by the other sellers, since it also committed itself to purchase and market all the producers' eggs; likewise it was logical for the producers to be willing to pay more for Spartan feed since by buying it they assured themselves of a guaranteed market for their eggs. The products offered by the other organizations were simply not similar enough to Spartan's package of feed and services to be used for comparative purposes.[2] See Smith v. Nelson, 123 Ga.App. 712, 725, 182 S.E.2d 332 (1971); Sammons v. Webb, 86 Ga.App. 382, 71 S.E.2d 832 (1952).
 
 
 5
 Producers also attempted to prove Spartan's price was unreasonable by proving its markup over its cost for the feed. The court properly rejected this attempt. Although there may be situations in which such an inquiry is the only possible way in which to determine the reasonableness of prices charged, see Kuss Machine Tool and Dye Co. v. El-Tronics, 393 Pa. 353, 143 A.2d 38 (1958), such is not the case here. Rather, we agree with the district judge that even if the producers were able to ascertain and prove exactly how much Spartan marked up the grain it sold to the producers, the possibility of prejudice prevented such an inquiry since another method of proving unreasonableness was available. The possibility of prejudice was especially strong here. Since Spartan was selling its feed as part of a marketing package, its markup on the grain, when introduced in isolation, might well have appeared to be unreasonably high.
 
 II.
 
 6
 The amount claimed by Spartan to be owed by producers includes "chargebacks" to their accounts based on alleged sub-standard hatching rates. According to the terms of the contracts, Spartan was permitted to reduce the price it paid to producers for any shipment of eggs in which less than 75% of the eggs hatched; if less than 65% hatched, Spartan could terminate the contract governing the shipment. Producers' attempted to introduce evidence showing that any inferior hatching rate occurring in Blackmon's and Ayers' flocks was due to Spartan's mishandling of the eggs, and that consequently Spartan should not be permitted to charge back their accounts. Their second argument on appeal is that the district judge erred in excluding this evidence and in directing a verdict for Spartan on the issue. Both points in this argument have merit; the evidence introduced or offered proved facts as follows.
 
 
 7
 Spartan utilized two methods for picking up the eggs: (a) with certain flocks the eggs were picked up in a trailer and transported directly to a hatchery in Pennsylvania; (b) with other flocks the eggs were picked up either in an old school bus or a van and taken to a facility in Royston, Georgia, reloaded into a trailer and transported to hatcheries in Ohio or Maryland. Appellant Meaders, whose eggs were transported by the first method, had no problems with hatchability. Blackmon, whose eggs were transported by both methods, had hatchability problems only with the second. Ayers, all of whose eggs were transported by the second method, had significant problems with hatchability resulting not only in chargebacks but also in the early termination of contracts.[3]
 
 
 8
 The principal factors affecting the hatchability of eggs are: (a) the handling of the eggs; (b) the temperature and humidity levels under which the eggs are maintained; (c) the length of time before the eggs are placed in an incubator; and (d) the quality of the hen's feed. These factors become more critical in the latter portion of the laying life of the flock. While Blackmon and Ayers had no control over the third and fourth factors, they had the proper facilities for maintaining temperature and humidity, and they complied with all industry standards in producing and handling the eggs. Spartan admitted that Blackmon was a "good producer" and that it had referred to Ayers as one of the more "conscientious" producers in its program. The driver employed in the second method of pickup did not recall any adverse reports when the eggs of these two producers were inspected at their farms.
 
 
 9
 On the other hand, there was evidence to the effect that in the loading process the eggs were handled roughly by Spartan's agents and that neither the school bus nor the van, in which the eggs often sat overnight, was equipped with a temperature and humidity control. Moreover, the route covered by the school bus or the van encompassed a three-county area; driving the complete route consumed as much as a day. Even the trailers onto which the eggs were reloaded were often unequipped with a temperature and humidity control, or if so equipped the device was not in working order. Finally, certain hatcheries had trouble with all of Spartan's eggs.
 
 
 10
 In making rulings on the foregoing evidence, the trial judge repeatedly excluded testimony and exhibits which did not directly relate to producers by name even though such evidence did relate to the pickup practices generally employed by Spartan in connection with Blackmon's and Ayers' eggs. Producers introduced scientific evidence on the impact of rough handling on hatchability through the testimony of an expert witness,[4] but the court ultimately ruled that with respect to each hatchability chargeback and contract termination, the producers would be required to establish the facts and circumstances surrounding the particular shipment of eggs from which it arose. The trial court likewise characterized evidence with respect to Spartan's failure to maintain proper temperature and humidity controls as creating mere suspicion and directed a verdict as to all of producers claims as to hatchability.
 
 
 11
 We hold that the district judge erred in making these rulings. Evidence of a trade or business custom is admissible for the purpose of showing that the custom was followed in a particular instance; likewise, evidence of other transactions or occurrences is admissible if relevant and not too likely to confuse a jury or prejudice the opposing party. T. F. Greene, The Georgia Law of Evidence 169, 171 (1957); McCormick, Evidence, 464, 2nd Ed. (1972); Russell v. Pitts, 105 Ga.App. 147, 149, 123 S.E.2d 708, 710 (1961) ("(I)t is generally permissible to allow a witness to testify from his own knowledge as to the usual custom or course of dealing involving the business routine of the party involved . . . .") In requiring the producers to introduce only evidence of Spartan's handling of the particular shipment at issue, the trial judge overlooked the teaching of cases such as Atlanta Coca-Cola Bottling Co. v. Shipp, 170 Ga. 817, 154 S.E. 243 (1930), which implicitly held that the bottler could show the inspection procedures it customarily employed for all its bottles even though it could not prove exactly how it had inspected the particular bottle alleged to have injured plaintiff.
 
 
 12
 The crucial factor mandating admissibility of the evidence in question is that it was not introduced to show that Spartan had acted negligently on other occasions, but rather to show that Spartan conducted this aspect of its business in a certain routine fashion. Presented with this evidence, the jury could properly infer that Spartan's procedures had been similar on the occasions at issue, and then decide whether or not Spartan was at fault. See Eaton v. Bass, 214 F.2d 896, 899 (6th Cir. 1954) (evidence of defendant's custom of inspecting brakes of its trucks held properly admitted when issue was whether defendant had been negligent with respect to brakes of particular truck: "The evidence was not received for the purpose of proving that appellees were not negligent because they followed a custom generally in use in the particular industry. It was offered and received for the purpose of proving the existence of a particular fact, namely, that the truck was inspected in a certain way, leaving open the question whether such inspection, if it did take place, was sufficient to constitute due care.")
 
 
 13
 We also hold that the district judge erred in granting Spartan's motion for a directed verdict on this issue. The evidence as summarized above clearly satisfies the requirement of Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969) that such a motion should be denied "if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions."
 
 III.
 
 14
 Producers' next contention is that the trial court erred in directing a verdict for Spartan on Blackmon's claim that he was entitled to price adjustments as to one flock supplied by Spartan and allegedly infected badly with leukosis, a blood disease. The only evidence introduced on this point was Blackmon's testimony that: (a) when he accepted delivery of the flock, he noticed the signs of the disease and complained to Spartan's representative that the birds were infected "more so than any that (he) had received," and that the representative promised to "check into it"; (b) a lab report from a veterinarian had confirmed the presence of the disease, but not its extent. Producers did not seek to introduce this report into evidence, and in fact Blackmon admitted he did not have it.
 
 
 15
 Under these circumstances, direction of a verdict against producers was proper. First, since producers were attempting to prove the existence of leukosis by the contents of a document, the best evidence rule required that the lab report itself be introduced unless its unavailability could be satisfactorily explained. In re Mobilift Equipment of Florida Inc., 415 F.2d 841 (5th Cir. 1969). Second, even if Blackmon's testimony alone were sufficient to establish the existence of the disease, the jury could not properly have calculated his damages without evidence of the seriousness of the infection. For this purpose Blackmon's assertion that the disease was more widespread than in any previous flock was patently inadequate; "(a) mere scintilla of evidence is insufficient to present a question for the jury." Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969).
 
 IV.
 
 16
 Producers' final contention is that the district court erred in refusing them leave to amend their pleadings to allege violations by Spartan of the federal Consumer Credit Protection Act, 15 U.S.C. § 1601 et seq., and the Georgia usury statutes, Ga.Code Ann. § 57-101 et seq.
 
 
 17
 Spartan filed suit in November, 1972; producers filed their original answers and counterclaims in December of that year. The counterclaims alleging statutory violations were not filed until 16 months later, two months prior to the trial. The district court should have allowed the amendment.
 
 Rule 13(f) Fed.R.Civ.P. provides:
 
 18
 When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, he may by leave of court set up the counterclaim by amendment.
 
 
 19
 Similarly, Rule 15(a), Fed.R.Civ.P. provides in pertinent part that a party may amend his pleadings "by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."
 
 
 20
 Courts have interpreted these provisions liberally, in line with the Federal Rules' overall goal of resolving disputes, insofar as possible, on the merits and in a single judicial proceeding. See Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); Sherman v. Hallbauer, 455 F.2d 1236 (5th Cir. 1972); Rosenberg Brothers and Co. v. Arnold, 283 F.2d 406 (9th Cir. 1960). The argument for allowing amendment is especially compelling when, as here, the omitted counterclaim is compulsory, see 3 J. Moore, Federal Practice § 13.33. The mere passage of time between an original filing and an attempted amendment is not a sufficient reason for denial of the motion. Applied Data Processing, Inc. v. Burroughs Corp., 58 F.R.D. 149 (D.Conn.1973).
 
 
 21
 It appears that granting the producers' motion would not have prejudiced Spartan or delayed the trial for additional discovery. From the ledger sheets attached to the complaint and introduced as exhibits at trial, it is clear that Spartan sold feed to the producers on open account; it would have been possible from these documents to determine whether the disclosures required by the Consumer Credit Protection Act had been made. Similarly, whether Spartan violated the Georgia usury laws could apparently have been easily determined. See Plastics Development Corp. v. Flexible Products Co., 112 Ga.App. 460, 145 S.E.2d 655 (1965).
 
 
 22
 Finally, the district judge denied the motion with no explanation of why he was doing so. "Outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).
 
 
 23
 Spartan's argument on cross appeal is that the district judge erred in denying its motions for a directed verdict and for a judgment notwithstanding the verdict with respect to producers' claim that Spartan breached its contractual obligation by forcing producers to sell certain flocks whose hatchability was above 65%. Spartan also argues that producers in any case failed to prove their damages from such early terminations with sufficient accuracy. In holding this argument to be without merit, we merely note that the evidence introduced by producers was sufficient to withstand Spartan's motions under the test of Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969), supra, part II.
 
 
 24
 The judgment of the district court is affirmed in part, reversed in part, and remanded.
 
 
 
 [1]
 Ga.Code § 109A-2-305(1) reads as follows:
 The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if
 (a) nothing is said as to price; or
 (b) the price is left to be agreed by the parties and they fail to agree; or
 (c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.
 
 
 [2]
 The judge stated that he would allow producers to introduce evidence of feed prices charged by Pillsbury, which offered a marketing service similar to Spartan's. Producers' counsel, however, did not take advantage of this opportunity
 
 
 [3]
 The contracts obligated Spartan to buy all acceptable hatching eggs during the laying life of the flock, roughly between 30 and 40 weeks, unless hatchability fell below 65%
 
 
 [4]
 The judge had previously rejected testimony by a lay witness, appellant Meaders