SPARTAN GRAIN & MILL COMPANY,
Plaintiff-Appellant, Cross-Appellee,

v.

Virgil AYERS et al., Defendants-Appellees, Cross-Appellants.

Joe ACKER, Plaintiff-Appellee,
Cross-Appellant,

v.

SPARTAN GRAIN & MILL COMPANY,
Defendant-Appellant, Cross-Appellee.

No. 76–2845.

United States Court of Appeals,
Fifth Circuit.

Oct. 3, 1978.

**420**

John C. Butters, Atlanta, Ga., J. Vincent Cook, Athens, Ga., for plaintiff-appellant, cross-appellee.

Jerre B. Swann, Atlanta, Ga., for defendants-appellees, cross-appellants.

Before WISDOM, TJOFLAT and VANCE, Circuit Judges.

WISDOM, Circuit Judge:

Chicken feed transactions in northeastern Georgia produced this important antitrust litigation involving integrated poultry operations. Spartan Grain & Milling Company (Spartan), a seller of chicken feed, sued chicken producers (Virgil Ayers, W. C. Meaders, Jr., Boyce Blackmon, and Joe Acker) for the unpaid balances of their feed bills. The producers counterclaimed, maintaining that Spartan had violated several provisions of the antitrust acts. Joe Acker, the fourth producer, filed his own antitrust suit against Spartan. The district court directed a verdict for the producers on their antitrust claims. We reverse and remand.

## I.

We must begin with an explanation of the broiler chicken industry.[1] The industry was born about fifty years ago. Fresh chicken had been a seasonal by-product of egg production. Less productive hens and young cockerels were culled from laying flocks in the late spring and early summer. These "June fryers" were tougher, dryer, and gamier than the broilers we eat today. In 1934 the average American ate eight ounces of chicken.

During the 1930's, enterprising egg producers realized that a market existed for chicken year-round. Broilers were raised independently of egg-laying flocks. Production of broilers quadrupled from 1934 to 1940, then doubled from 1940 to 1945. After World War II the expansion continued, largely as a result of capital investment by feed manufacturers and chicken processors. By 1954 Americans were eating an average of 13½ pounds of broiler chicken a year. Supermarket distribution provided one boost; later, fast-food operations provided

---

1. This discussion of the structure and development of the industry is based largely on three opinions and one law review article. *See Bayside Enterprises, Inc. v. N. L. R. B.*, 1977, 429 U.S. 298, 97 S.Ct. 576, 50 L.Ed.2d 494; *National Broiler Marketing Ass'n v. United States*, 1978, —— U.S. ——, 98 S.Ct. 2122, 56 L.Ed.2d 728, *aff'g* 5 Cir. 1977, 550 F.2d 1380; and *Spartan Grain & Mill Co. v. Ayers*, 5 Cir. 1975, 517 F.2d 214. The article, Brown, *United States v. National Broiler Marketing Association: Will the Chicken Lickin' Stand?*, 56 N.C.L.Rev. 29, 37–46, is particularly helpful.

another. By 1975 the Department of Agriculture reported per capita consumption of chicken in this country as 40.9 pounds. The World Almanac 143 (1978).

The bird in question is a young chicken, between seven and ten weeks old. Broilers, also known as fryers, may be male or female. The market distinguishes between broilers and other poultry. Production of broilers involves several distinct steps.

The process begins with the primary breeder. This step produces chickens which are used as breeders, not as broilers. The chicks are shipped to "producers", such as those in this case, typically when they are one day old. Most of the birds shipped to the producers are pullets, although a few cockerels are included. After a week, the producers debeak the chicks. Soon, vaccinations begin. The birds are vaccinated for several fowl diseases, and tested for others. By the time they are twenty-four weeks old, they are ready to begin laying eggs. A good flock is productive for 38 to 40 weeks from the time they begin laying.

The third step takes the eggs to the hatchery. There, they become broiler chicks. These chicks then move to the fourth step, delivery to the growers. Each of the first four steps involves the feed merchants, providing grain for the flocks. In the fifth step the processor slaughters and dresses the broiler to prepare it for market. The customers for whom the broiler is prepared are often large supermarket chains or fast-food chains.

In the first years of the industry, each of the steps was taken by different people. Title to the product changed hands with each stage of the production process. After World War II the industry increasingly moved toward integrating the production process. The greater financial resources of the feed merchants and the processors enabled them to finance the expansion of the industry. The integrators expanded their control of the birds at each stage. Today, 99 percent of the broilers are raised either by "contract growers" or by the integrated firms themselves. Contract growers take the newly hatched broilers and raise them

for a fixed price a dozen. Chicken feed and veterinary needs are provided by the integrated firm. Title to the birds rests with the integrated firm. And control over the production decisions rest with the integrated firm. Other stages in the process have also lost much of their independence.

The parties in this case were out of step with their industry. Spartan was a feed merchant, operating for the most part on a non-integrated basis. The producers owned hen houses and had been in the poultry business for up to twenty years. The producers had raised laying flocks both on a contract basis and on an independent basis. They preferred the independent contractor status: they made their own decisions, paid for the services they wanted, and had opportunities for greater return. Flock placements for that arrangement had not been available in their area since 1962. They would take flocks on a contract basis. They could not buy and raise flocks completely on their own. The risk that the hatching eggs could not be marketed would be too great. So, under either the independent or the contract system, the producers would produce only when they had someone committed to buy their hatching eggs.

In 1967 and 1968 the bottom fell out of the broiler industry in northeastern Georgia. Several firms had actively placed flocks on a contract basis in that area. Some terminated their operations entirely; others pulled out of the producers' area, Franklin, Hart, and Elbert Counties. There were no flocks available with guaranteed markets for their eggs on either an independent or a contract basis. Then, Spartan stepped into the scene.

Integration of the industry caused problems for Spartan. As other feed merchants increased their control over producers and growers, Spartan's markets were disappearing. Its solution to integration was to arrange its own contractual integration. Spartan negotiated with the broiler hatcheries in Pennsylvania and Ohio for commitments to take hatching eggs. It also arranged for primary breeders to produce flocks of laying chicks. Finally, it offered

these flocks, with guaranteed markets for their eggs, to the producers in northeastern Georgia. Title to the laying chicks was to pass from the primary breeder to the producer. Spartan would then buy the eggs from the producers and sell them to the hatcheries. The producers received independent contractor status. They paid for their chicks' feed and veterinary attention; they decided whether they wanted more flocks and when. Spartan paid several cents a dozen above the long term market price for eggs, and nine cents a dozen above the spot market price in Georgia.[2]

There was only one catch. Spartan pursued this contractual integration to keep its feed market. It required producers in its program to purchase only its feed. Its feed cost $15 to $20 more per ton than comparable feed.[3]

The producers could join Spartan or stop producing broiler eggs. They joined. Meaders signed four contracts covering the period from October 1968 to July 1972. Ayers signed four contracts covering the period from May 1969 to August 1971. Blackmon signed five agreements for the period from November 1968 to May 1972. Acker had been dealing with Spartan since 1965. During the time relevant to this suit, he signed three contracts covering the period from May 1969 to January 1972.

Spartan phased out this program in 1971 and 1972. In November 1972 it filed suit in federal court against Ayers, Blackmon, and Meaders for the unpaid balances of their feed accounts. Federal jurisdiction stemmed from diversity of citizenship. In December 1972 these producers answered and asserted antitrust counterclaims. In August 1973 the district court struck the antitrust contentions as defenses to the contract action, and severed the antitrust counterclaims for later trial. That month Acker

filed suit against Spartan on antitrust grounds. His suit was consolidated with the counterclaims of the other producers.

The contract portion of the case, with the non-antitrust counterclaims, was tried in May 1974. The district court directed a verdict for Spartan on the accounts claim and on four counterclaims. The court let one counterclaim go to the jury, which found for the producers. On the accounts, Meaders owed about $9,000, Blackmon about $22,000, and Ayers about $24,000.

All parties appealed. Spartan argued that the judge should have directed a verdict for it on the counterclaim that went to the jury; the producers argued that the trial judge erred in directing verdicts against them on their other counterclaims. The producers did not appeal the directed verdict on the accounts. This Court upheld the directed verdicts on two counterclaims, reversed the directed verdicts on two others, and found sufficient evidence to support the jury's verdict on the counterclaim the producers had won below. *Spartan Grain & Mill Co. v. Ayers*, 5 Cir. 1975, 517 F.2d 214. The remanded issues were settled without another trial.

The producers' antitrust claims were tried in August 1975. They asserted that Spartan's dealings illegally tied the sale of feed to the sale of chicks and cockerels and to the purchase of eggs. These actions, they argued, were tie-in arrangements which violated section one of the Sherman Act, 15 U.S.C. § 1, and section three of the Clayton Act, 15 U.S.C. § 14. They also urged that these were reciprocal dealings prohibited by section one of the Sherman Act.

By September 1974 both sides had filed motions for summary judgment. The judge did not rule on the motions. Four days

---

**2.** There was a dispute as to the actual differential. The parties stipulated to a nine cent difference, but the producers' objections at trial seem to have been that the nine cent difference existed only on spot sales, and not on other long run contracts. The resolution of this dispute is not important in this appeal.

**3.** Again, this difference was also the subject of controversy at trial. Spartan admitted that its price was higher, but pointed out that it performed services that some of the other feed companies did not perform. On the other hand, the producers urged that the difference was even greater, because Spartan's feed was inferior.

before trial he refused to grant summary judgment on the ground that such treatment was not appropriate in antitrust cases.

At the close of the producers' evidence, Spartan moved for a directed verdict. The trial court denied Spartan's motion, and expressed its conclusion that the producers had demonstrated a per se violation of the law. The Court ruled that, whether viewed as reciprocal dealing or as a traditional tie-in, the transaction was a tying arrangement that constituted a per se violation under *Northern Pacific Railway Co. v. United States*, 1957, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545. The trial court then refused to accept the evidence on liability Spartan had proffered. According to Spartan's counsel, that evidence dealt with the reasonableness of Spartan's program and the alternatives open to the producers. The rest of the trial therefore was solely on the question of damages. The judge announced to the jury that he had decided, as a matter of law, that a violation had occurred.

After a trial on the issue of damages the jury returned verdicts for the producers, before trebling, ranging from $7,000 to $15,000. Final judgment was entered nine months later, after the trial court considered attorneys fees, a Truth in Lending Act question, and the amount of interest due on the earlier contract judgment.

All parties appealed. Spartan urges that the district court's decision on the liability question was in error both procedurally and substantively and that the jury's verdict on damages was inadequately supported. The producers take exception to two of the trial court's evidentiary rulings concerning damages. They also appeal from the award of attorneys fees, the date of the court's award of interest on the contract judgment, and the court's ruling that the Truth in Lending Act claim was time-barred.

## II.

The trial court's conclusion that a per se violation of the antitrust laws occurred is the central issue of this appeal. Although the parties had argued before trial about the proper characterization of their dealings, the district judge did not consider the distinction crucial. Under either characterization, he felt that *Northern Pacific* required a decision for the producers on liability. We agree that the characterization is relatively unimportant; we disagree, however, with the lower court's conclusion on liability.

Tying arrangements have been defined as "agreement[s] by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product . . . ." *Northern Pacific*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545. Tying arrangements have repeatedly been held to be per se violations of both section one of the Sherman Act and section three of the Clayton Act. *E. g., International Business Machines Corp. v. United States*, 1936, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085; *International Salt Co. v. United States*, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; *Northern Pacific Railway Co. v. United States*, 1958, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545; *United States v. Loew's Inc.*, 1962, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11; *Fortner Enterprises, Inc. v. United States Steel Corp.*, 1969, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (*Fortner* I).

Per se illegality, however, has never meant that all tying arrangements are in fact illegal. Instead,

"[t]hey are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected."

*Northern Pacific*, 356 U.S. at 6, 78 S.Ct. at 518. Recent cases in the area have focused on whether "sufficient economic power with respect to the tying product" exists. *United States Steel Corp. v. Fortner Enterprises, Inc.*, 1977, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (*Fortner* II). Although the early tying cases were brought by the government, suits by private purchasers have become well-established.

In contrast to tying arrangements, reciprocal dealings have not been the subject of extensive case law development. A reciprocal dealing arrangement exists when two parties face each other as both buyer and seller. One party offers to buy the other party's goods, but only if the second party buys other goods from the first party. For example, if one party is both a food wholesaler and a provider of goods used in processing foods, food processors may be faced by a reciprocal requirement. The first party might agree to buy the processors' products only if the processors buy the processing goods from it. *See Federal Trade Commission v. Consolidated Foods Corp.*, 1965, 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95.

Although there was an earlier line of reciprocity cases in the Federal Trade Commission during the 1930's,[4] the *Consolidated Foods* case was the first recent case in this area. That was an action brought by the F.T.C. under section seven of the Clayton Act to set aside a merger. The Supreme Court held that reciprocity could violate the Clayton Act.

> "We hold at the outset that the 'reciprocity' made possible by such an acquisition is one of the congeries of anticompetitive practices at which the antitrust laws are aimed. The practice results in 'an irrelevant and alien factor,' 62 FTC ——, intruding into the choice among competing products . . . ."

*Consolidated Foods*, 380 U.S. at 594, 85 S.Ct. at 1221. The Court found that substantial evidence supported the Commission's finding that the merger violated the Clayton Act, but its conclusion does not have clear implications for non-merger cases. The Court did not state whether these arrangements are per se violations; nor did it consider them in the context of private suits.

The United States pressed for application of a per se standard to any agreements, express or implied, to sell only on reciprocal terms. *See United States v. General Dy-*

*namics Corp.*, 1966 S.D.N.Y., 258 F.Supp. 36; L. Sullivan, Antitrust 492–95 (1977). In *General Dynamics* the government sued again to set aside a merger. The district court agreed, apparently finding reciprocal dealings per se violations of the antitrust laws. 258 F.Supp. at 59.

Our research has turned up one reciprocity suit brought as a private action by a party to the arrangement. *Columbia Nitrogen Corp. v. Royster Co.*, 4 Cir. 1971, 451 F.2d 3. Royster sued Columbia for breach of contract; Columbia responded in part with an antitrust counterclaim based on reciprocal dealings. The trial judge distinguished between coercive and non-coercive reciprocity, resurrecting a distinction made by the F.T.C. in the 1930's. See L. Sullivan, Antitrust 493 (1977). The trial judge allowed Columbia to introduce evidence that Royster had economic power as a buyer of nitrogen from Columbia. Royster denied having this power. This issue of coercive reciprocity was submitted to the jury on a per se basis: the jury had to find only coercion and substantial impact on interstate commerce. The jury found for the defendant. 451 F.2d at 13. On appeal Columbia maintained that it should have been able to go to the jury on the issue of "non-coercive" reciprocity. The Court of Appeals assumed that non-coercive reciprocity could violate the Sherman Act, but held that, as a matter of law:

> "[W]hen parties of substantially equal economic strength mutually participate in the formulation and execution of the scheme and bear equal responsibility for the consequent restraint of trade, each is barred from seeking treble damages from the other."

451 F.2d at 15–16 [footnote omitted]. It found that the Columbia-Royster relationship fit that description and affirmed.

The transactions at issue in this case could be characterized either as tie-ins or as reciprocal dealing. The attorneys for each side have argued persuasively each position. On the one hand Spartan was buying eggs

---

4. *See California Packing Corp.*, 1937, 25 F.T.C. 379; *Mechanical Manufacturing Co.*, 1932, 16 F.T.C. 67; *Waugh Equipment Co.*, 1931, 15 F.T.C. 232.

and selling feed. The parties agreed that the guaranteed market for eggs was crucial to the producers. On the other hand Spartan did arrange for the producers to buy flocks. In some cases Spartan itself sold the chickens to the producers; in others, the legal title was transferred from the primary breeders but all the arrangements, including credit arrangements, were made by Spartan. Spartan demanded that the producers take its feed in order to participate in a package that included Spartan as both buyer and seller.

■ Fortunately, we need not shape this arrangement to fit either label. The two labels refer to similar phenomena. In each case one side of a transaction has special power in the market place. It uses this power to force those with whom it deals to make concessions in another market. In tying arrangements, a seller with economic power forces the purchaser to purchase something else to obtain the desired item. In reciprocal dealings a buyer with economic power forces a seller to buy something from it to sell its goods. In both cases the key is the extension of economic power in one market to another market. Thus, in cases brought by parties to the agreement, the standard for judging reciprocal agreements should be no higher than the standard for judging tie-in arrangements.[5] Therefore, in this case we review the district court's action under the per se standard appropriate for tying cases.[6] The proper standard for judging reciprocal arrangements is no higher.[7]

■ As discussed, a tying arrangement is illegal per se whenever "a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." *Northern Pacific*, 356 U.S. at 6, 78 S.Ct. at 518. There is no doubt here that a substantial amount of interstate commerce is involved; the dispute centers on whether Spartan had sufficient economic power in the relevant market. In determining this, we have the benefit of a Supreme Court decision not before the district judge: *United States Steel Corp. v. Fortner Enterprises, Inc.*, 1977, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (*Fortner* II). We discuss it at some length because we regard it as controlling the case before us.

*Fortner* involved the sale of prefabricated homes by United States Steel to Fortner Enterprises. A subsidiary of U.S. Steel offered 100 per cent financing to Fortner for the purchase. The financing was at a particularly low rate and on terms favorable to Fortner. The financing was available, however, only on sales of homes from U.S. Steel to Fortner. The homes themselves were more expensive than those of U.S. Steel's competitors. The relationship between Fortner and the steel company soured;

5. We intimate no view as to the proper standard in a suit brought by the government against reciprocal dealings. The government's concern in such cases is with the preclusion of other dealers from the market, not with the effects of the agreement on the parties to it. Different considerations may govern.

6. It is also possible to base a tying suit on the general prohibitions of the Sherman Act, without relying on the per se rule. There, the plaintiff would have to embrace rule of reason evidence and arguments. *See Fortner* I, 394 U.S. at 500, 89 S.Ct. 1252, *Fortner* II, 429 U.S. at 612 n.1, 97 S.Ct. 861. The producers did not take this course.

7. We find no reason to adopt the view expressed in *Columbia Nitrogen Corp. v. Royster Co.*, 4 Cir. 1971, 451 F.2d 3, concerning the damages available in a private reciprocity action. That decision assumed a violation of the Act was made out, then held that there were no damages. Our decision rests on the earlier question, whether there was a violation.

In *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 1977, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568, the Supreme Court overruled *United States v. Arnold, Schwinn & Co.*, 1967, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249, which had imposed a per se standard of illegality on vertically imposed territorial divisions. That decision cautions us against imposing strict standards of antitrust liability in fields where the economic consequences of the arrangements are not clear. Given the limited development of the law dealing with reciprocity, this is not a case for application of a standard *stricter* than the per se standard applied to tying arrangements.

Fortner brought an antitrust action, contending that the credit had been tied to the purchase of U.S. Steel's homes, in violation of section one of the Sherman Act. A summary judgment for U.S. Steel was reversed by the Supreme Court. *Fortner Enterprises, Inc. v. United States Steel*, 1969, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (*Fortner* I). After a trial on remand, the district court directed a verdict for Fortner on the issue of liability. The Court of Appeals reversed and remanded. 6 Cir. 1971, 452 F.2d 1095, *cert. den.* 1972, 406 U.S. 919, 92 S.Ct. 1773, 32 L.Ed.2d 119. On remand the district court took additional evidence and again found that U.S. Steel was liable.[8] The Court of Appeals affirmed, 6 Cir. 1975, 523 F.2d 961. The Supreme Court reversed in a unanimous opinion.

The only issue was whether Fortner had shown that U.S. Steel had economic power in the market for the tying product, credit. Four factors were advanced by Fortner to justify the lower courts' conclusion in its favor: the financial strength of U.S. Steel, the large number of similar arrangements made by U.S. Steel, the higher than market price paid for the houses, and the unique terms of the financing. 429 U.S. at 614, 97 S.Ct. 861.

The Court found the size of U.S. Steel irrelevant. It stressed that the size alone had not been shown to give the credit division any advantage in the cost of its funds or in its efficiency. The Court stressed that no cost advantage to U.S. Steel had been shown; therefore, nothing had been demonstrated about economic power. 429 U.S. at 617, 97 S.Ct. 861. The Court also found that the number of tying arrangements U.S. Steel entered did not show economic power. That factor is important only in "the absence of other explanations for the willingness of buyers to purchase the package". 429 U.S. at 618 n.10, 97 S.Ct. at 867. The non-competitive price paid by Fortner for homes was explained by the value of the entire package. "Proof that Fortner paid a

higher price for the tied product is consistent with the possibility that the financing was unusually inexpensive and that the price for the entire package was equal to, or below, a competitive price." 429 U.S. at 618, 97 S.Ct. at 866 [footnote omitted].

Thus, the Supreme Court found that the question came down to one of uniqueness:

"The most significant finding made by the District Court related to the unique character of the credit extended to Fortner. This finding is particularly important because the unique character of the tying product has provided critical support for the finding of illegality in prior cases. Thus, the statutory grant of a patent monopoly in *International Salt v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, [75 U.S.P.Q. 184]; the copyright monopolies in *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, and *United States v. Loew's Inc.*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11; and the extensive land holdings in *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545, represented tying products that the Court regarded as sufficiently unique to give rise to a presumption of economic power."

429 U.S. 619, 97 S.Ct. 867 [footnotes omitted]. The Court put the uniqueness question in a nutshell: "In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product". 429 U.S. at 620, 97 S.Ct. at 868. *See also Fortner* I, 394 U.S. at p. 505 & n.2, 89 S.Ct. 1252. The fact that the financing arrangement was unique, "without like or equal", did not mean that the seller possessed economic power.

"Quite clearly, if the evidence merely shows that credit terms are unique because the seller is willing to accept a lesser profit—or to incur greater risks—than its competitors, that kind of uniqueness will not give rise to any inference of economic power in the credit market . .

---

**8.** The second trial after remand was made to the bench, because the parties waived trial by jury. The district court's conclusion came not

on a directed verdict or summary judgment, but after this bench trial.

Without any evidence that the Credit Corp. had some cost advantage over its competitors—*or could offer a form of financing that was significantly differentiated from that which other lenders could offer if they so elected*—the unique character of its financing does not support the conclusion that petitioners had the kind of economic power which Fortner had the burden of proving in order to prevail in this litigation."

429 U.S. at 621–22, 97 S.Ct. at 868.

*Fortner* II requires that this case be reversed. The trial judge's discussion of the case shows that he was concerned because "nobody else had that arrangement at this particular time . . . ." The arrangement, which included providing birds and buying eggs, was being " 'use[d] as a lever' " according to the trial judge, quoting a Spartan internal memorandum. Citing *Northern Pacific*, he stated that "[t]he very existence of this host of tying arrangements is itself compelling evidence of the defendant's great power, at least, where [as] here no other explanation has been offered for . . . these restraints". The trial court concentrated on the producers' position, and concluded that they had no reason to enter a requirements contract with Spartan for their feed except their need for egg markets and flocks. The court found that Spartan's ability to deal with hatcheries in other states, an ability that the producers lacked, produced its economic power.

The court relied on two of the factors urged by Fortner, the existence of tying arrangements and the uniqueness of the package. In *Fortner* II the Supreme Court rejected the first argument because there were other explanations for the willingness of the buyers "to purchase *the package*". The trial court here pointed out that there were no other explanations for the willingness of the producers to agree to buy all their feed from Spartan, but the evidence makes clear their reason they "purchase[d] the package"—their alternative was to stop raising breeding flocks of broilers. Thus, this argument really stands with the

uniqueness argument. Yet, although Spartan's program was "without like or equal" in that area of Georgia, it was not shown to be unique in the sense required in *Fortner* II. There was no evidence as to *why* Spartan was the only firm offering this package. There was no evidence that Spartan had any cost advantage over its rivals. In fact, the eventual termination of the program might support an inference that Spartan had no advantages over its rivals; instead, it may have made a mistake they avoided. Nothing presented in the district court showed that Spartan's program was "significantly differentiated from that which other [companies] could offer if they so elected . . . .". In light of *Fortner* II, therefore, the requirements for finding a per se violation of the antitrust laws were not shown.

In their supplemental brief the producers argue that *Fortner* II does not damage their position. They urge that credit, the product involved in *Fortner* II, is not chickens. Credit is fungible and widely available. The producers point out again that flock placements, with guaranteed egg markets, were scarce. This argument is merely the uniqueness point in a different guise. The producers must show that Spartan had some economic advantage which enabled it to offer this arrangement when its rivals could not. The producers contend that price comparisons, easily made by Fortner, were impossible for them because the price of the feed they contracted for varied. While that may have made comparisons difficult, the producers have not shown that comparisons were impossible. All producers and consumers, and particularly farmers, operate in markets where prices may vary. The producers have already been defeated in their contention that the prices charged by Spartan were unreasonable in contravention of the Uniform Commercial Code, § 2–305(1), Ga.Code § 109A–2–305(1). *Spartan Grain & Mill Co. v. Ayers*, 5 Cir. 1975, 517 F.2d 214, 217. The producers urge that Spartan was much more sophisticated and powerful than they. The economic power *Fortner* II requires, however, must come from Spartan's relationship with its competition. If it had effective competi-

tors in this field, economic power would not have been shown, even though *all* the companies be more sophisticated and powerful than the producers.

The producers make one other attempt to avoid the force of *Fortner* II. They urge that under section three of the Clayton Act, economic power is not required for a per se violation. The Clayton Act, passed as a response to what Congress considered grudging constructions of the Sherman Act by the courts, specifically bans tying arrangements.

> "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to . . . make a sale or contract for sale of goods, . . . supplies, or other commodities . . . for use, consumption, or resale within the United States . . . on the condition, agreement or understanding that . . . [the] purchaser thereof shall not use or deal in the goods, . . . supplies, or other commodities of a competitor or competitors of the . . . seller, where the effect of such . . . sale . . . may be to substantially lessen competition . . . in any line of commerce."

15 U.S.C. § 14.

First, this section should not be applied to this case. Although we have recognized that the situation here partakes of elements of both tying arrangements and reciprocal arrangements, the true tying product was the purchase of the eggs. The producers did not contend that they could not buy flocks without egg commitments, merely that neither they nor any other producer would do such a foolish thing. The egg commitments were crucial, and such commitments are not "a sale or contract for sale of goods". Though we believe that the law of this case can best be found from the tying precedents, it does not fall within the explicit language of the Clayton Act.

Second, the producers overstate the distinction between the Clayton and Sherman Acts in this field. Although this Court has stated, in dictum, that section three of the Clayton Act does not require a showing of economic power, *Sulmeyer v. Coca Cola Co.*, 5 Cir. 1975, 515 F.2d 835, it drew that conclusion from a case from the Fourth Circuit. *Advance Business Systems & Supply Co. v. SCM Corp.*, 4 Cir. 1969, 415 F.2d 55, cert. den. 1970, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101. In *Advance Business Systems*, however, the Fourth Circuit relied on a presumption of economic power it drew from the existence of the tying arrangements. It based that presumption on two Supreme Court cases, *Northern Pacific* and *Fortner* I. In light of *Fortner* II, that presumption is no longer strong enough to warrant the conclusion that no separate showing of economic power is necessary in the Clayton Act.[9]

■ The producers on this record can prevail neither under the Sherman Act nor under the Clayton Act. The question remaining is whether judgment should be entered for the defendant, as was the case in *Fortner* II, or the case be remanded for a new trial. The parties built this record on a faulty conception of the requirements for proving a per se violation. Their misconception was shared by the district court, and was reasonable in light of the earlier Supreme Court decisions in the field. No evidence was introduced to show that Spartan did *not* have the kind of cost advantage that the Supreme Court considered impor-

---

**9.** In *Advance Business Systems*, the Court of Appeals for the Fourth Circuit said:

"Congress singled out tie-ins for special treatment in the Clayton Act upon the generally accepted view that they rarely have any function other than suppression of competition. For the same reason, a seller's successful imposition of a tying arrangement on a substantial amount of commerce may be taken as proof of his economic power over the tying product. See *Fortner Enterprises* [I]

. . . *Northern Pacific* . . . [citations omitted]. The Clayton Act *therefore* requires no separate showing of economic dominance where a tying arrangement affects sufficient commerce." [Emphasis added.]

415 F.2d at 62. At least one commentator has attacked use of a weaker standard under the Clayton Act. *See* L. Sullivan, Antitrust 440–41 (1977).

tant in *Fortner* II. We think, therefore, that the case should be remanded for a new determination of the crucial factual question: did Spartan have economic power in this market?

### III.

Our resolution of the substantive antitrust issue in this case disposes of several other appealed questions.[10] Four issues remain.

■ First, the producers contend that the judge erred in refusing to permit them to introduce evidence dealing with the quality of Spartan's feed. They maintain that Spartan's feed became less nutritious at one point. Thus, their damages from being required to buy Spartan feed should have included not only the price difference, but a sum for the lower quality of the chicken feed. The trial court refused to allow expert testimony on the quality, apparently in response to Spartan's argument that this issue had been resolved in the trial of the contract claims. Rec., Vol. VII, 142–52. The trial court in the first case did direct a verdict against the producers on the feed question. The producers did not appeal. Although the question is now one of antitrust damages, the issue is the same. The producers cannot raise it again.

■ Second, the producers charge the trial court erred by allowing Spartan interest on the contract judgment from the date of entry of the district court judgment. The producers appealed the district court's directed verdicts against their counterclaims to this Court, won reversal on several of their claims, and then settled those issues with Spartan. The producers advance two reasons why interest should run from a later date: the reversals meant that no final judgment had been entered below, and the long delay, against the producers' wishes, in trying the antitrust case made it unfair to charge them with interest from before the conclusion of that case. The producers won reversals in the contracts case on several counterclaims; they never appealed the directed verdict granted Spartan on its accounts. As to that money, the judgment of the district court was not just affirmed, which under Rule 37 of the Federal Rules of Appellate Procedure would make interest run from the date of the district court judgment. The judgment was never questioned. The separate issues of the counterclaims should not disturb that unappealed ruling. Fairness does not require a different result. The contract claims were on the producers' accounts with Spartan. They complain that the interest run up over the past years amounts to a formidable sum. So does the sum representing the returns Spartan might have made had the producers paid their accounts when due. The producers have had the use of these funds since the district court's first judgment; it is not unfair that interest should run against them from that time.

Third, the producers appeal from the district court's ruling that their Truth-in-Lending Act claim was time-barred. Their counterclaim involved interest rate disclosures. The last purchase of feed any pro-

---

10. The question whether the district court erred procedurally by granting a directed verdict at the close of *plaintiffs'* evidence is now moot. So is the question whether the district court abused its discretion in the award of attorneys' fees. The prevailing party in this litigation is once again in question. The evidentiary issue concerning Spartan's practices in other areas should be reconsidered by the trial court in light of the larger inquiry into Spartan's market position required on remand.

Two final issues Spartan raises must be rejected. (a) The district court did not err by failing to find, as a matter of law, that the producers had no damages. We view this question as dependent, of course, on the liabili-
ty question. If liability had been properly established, damages could have been recovered. The amount of those damages was properly submitted to the jury. (b) Nor did the district court err in rejecting Spartan's res judicata argument. Spartan urges that because, in the contract action, the lower court and this Court agreed that the price of its feed was not unreasonable under U.C.C. standards, it could not have been a violation of the antitrust laws. Spartan has cited no authority for the proposition that commercially reasonable prices cannot still be higher than those which could have been obtained absent an antitrust violation. The argument is meritless.

ducer made from Spartan was in July 1972. The counterclaim was asserted in March 1974. The Truth-in-Lending Act has a one year statute of limitation. 15 U.S.C. § 1640(e). The producers also maintain, however, that their counterclaim be treated in the alternative as an equitable recoupment, which admittedly is not subject to a statute of limitations.

■ We think that the district court properly found the Truth-in-Lending counterclaim time-barred. Whether or not it properly applied *Goldman v. First National Bank*, 1975, N.D.Ill., 392 F.Supp. 214, in finding that the statute ran from the time the purchase contracts were made, the claims would still be barred. Spartan's complaint was filed within one year of the last purchases. The producers assert that the complaint tolled the statute of limitations on all compulsory counterclaims, citing *De Vito v. Hoffman*, 1952, 91 U.S.App. D.C. 263, 199 F.2d 468. That proposition has not been entirely accepted. *See* Wright & Miller, Federal Practice and Procedure, §§ 1409, 1419. The producers assumed too easily, however, that a Truth-in-Lending counterclaim to a suit on an account is a compulsory counterclaim. While we have found no precedent directly on point, two district courts have decided the converse question: that actions for money owed are permissive counterclaims to Truth-In-Lending Act suits. *Zeltzer v. Carte Blanche Corp.*, 1976, W.D.Pa., 414 F.Supp. 1221, *Roberts v. National School of Radio & Television Broadcasting*, 1974, N.D.Ga., 374 F.Supp. 1266, 1270–71. In that situation a conclusion that the counterclaim was compulsory would have required a federal court to take jurisdiction over state law matters; here, the counterclaim involves the federal statute. Although that distinction would make compulsory status more likely, we feel this counterclaim is still better considered permissive. Although it arises from the contract transaction, the Truth-in-Lending Act claim involves entirely separate questions of law and fact from those dealing with the producers' liability on their accounts. Therefore, the statute of limitations was not tolled by the filing of the complaint even if the filing would toll the statute for a compulsory counterclaim. Thus, whether the statute began to run when the contract was made, as the district court held, or when the transactions were consummated, this counterclaim was time-barred.

The producers' recoupment claim remains. As they point out, recoupment has been recognized as an equitable defense, not controlled by statutes of limitations. The record does not show why the district court rejected the producers' request for recoupment. The judge did hold that the producers' usury claims had been abandoned. Whether this included the recoupment claim or not is unclear. The record dealing with the interest question is limited: we have not been able to discover whether recoupment was raised below. The producers' recoupment argument appears at least substantial. On remand, if the district court concludes that the issue was presented to it originally, it should deal with the issue. If the issue was abandoned, of course, the district court need not give the producers another chance.

## IV.

Integration of the broiler chicken industry continues to provide difficult questions for appellate courts. *See National Broiler Marketing Ass'n v. United States*, 1978, —— U.S. ——, 98 S.Ct. 2122, 56 L.Ed.2d 728 (Capper-Volstead antitrust exemption for farmers' cooperatives does not apply to N.B.M.A.); *Bayside Enterprises, Inc. v. N.L.R.B.*, 1977, 429 U.S. 298, 97 S.Ct. 576, 50 L.Ed.2d 494 (truck drivers transporting feed for a vertically integrated poultry firm are not agricultural laborers, exempt from the N.L.R.A.). Spartan's efforts toward contractual vertical integration present questions in the area between tying arrangements and reciprocal dealings, in a time when antitrust law in that field is undergoing a change in emphasis. As a result, we must reverse and remand for a new trial. The judgment of the district court is AFFIRMED IN PART and REVERSED AND REMANDED IN PART.