**SPARTAN GRAIN & MILL COMPANY, Plaintiff-Appellant, Cross-Appellee,**

v.

**Virgil AYERS, W.C. Meaders, Jr., Boyce Blackmon, and Joe Acker, Defendants-Appellees, Cross-Appellants.**

No. 83–8003.

United States Court of Appeals, Eleventh Circuit.

July 5, 1984.

Rehearing and Rehearing En Banc Denied Aug. 9, 1984.

John C. Butters, Atlanta, Ga., for Spartan Grain & Mill Co.

Jerre Swann, Atlanta, Ga., for Ayers, et al.

Before GODBOLD, Chief Judge, RONEY and KRAVITCH, Circuit Judges.

RONEY, Circuit Judge:

This antitrust suit involves several participants in the broiler chicken industry. Virgil Ayers, W.C. Meaders, Jr., Boyce Blackmon, and Joe Acker produce eggs from which the broiler chickens were hatched. Spartan Grain & Mill Company, supplies feed to chicken farmers. The broiler chicken producers claim that Spartan violated the antitrust laws by tying the sale of its feed to its guarantee of a market for the producers' eggs. Two trials have resulted in verdicts for the producers. The central question on this appeal is whether Spartan had sufficient economic power that its marketing program must be viewed as an antitrust violation. On the basis of jury answers to special interrogatories, the district ruled that Spartan had such power. We hold that the jury verdict does not support this finding and reverse the judgment.

Our earlier decision in this case gives a detailed history and explanation of the broiler chicken industry. *Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419, 420–22 (5th Cir.1978), *cert. denied*, 444 U.S. 831, 100 S.Ct. 59, 62 L.Ed.2d 39 (1979). Briefly restated, the raising of a broiler chicken involves five distinct steps: (1) *primary breeders* hatch breeding flock chicks; (2) *producers* raise the breeding flocks and then collect the eggs; (3) *hatcheries* receive the eggs to hatch the chicks; (4) *growers* raise the chicks to the age that they can be sold as broilers; and (5) *processors* slaughter the broiler chickens and prepare them for market. Another participant in this process is the *feed merchant* who supplies the grain for feeding the chickens during each of the first four steps. The parties to this suit are a *feed merchant*, Spartan, and *producers* of broiler eggs, Ayers, Meaders, Blackmon, and Acker.

As the industry originally evolved, separate individuals handled each step of the production process. A number of inefficiencies resulted from this arrangement. First, there was a duplication of management and accounting personnel. Second, the lack of coordination between the various stages in the industry combined with the natural time constraints of the product created a great risk that there would not be a buyer for every seller, or vice versa, along the production chain. This often resulted either in a waste of product or in capital facilities sitting idle. Third, collection problems occurred because money had to change hands between each stage.

To reduce these inefficiencies, the industry began to integrate the various steps in the production process. In north Georgia, the locale of the present controversy, well over 90% of the industry was integrated by the end of the 1960s. The evidence at trial showed two types of integrated firms. In one type all stages in the production process as well as a feed mill are owned and operated by a single entity. Other integrated firms are comprised only of a feed mill, hatchery, and processing plant. The tasks of producing broiler eggs and growing broilers are "contracted out".

A producer under a contract arrangement with an integrated firm faces substantially less risk than when functioning as an independent. The integrated firm

supplies the breeding flock and provides all medical care and feed required during the life of the bird. Title to the chickens remains in the integrated firm, and it takes the eggs at an agreed upon price. Under an independent arrangement, however, a producer purchases his own flock and administers his own medical care. The independent also shoulders the major cost in producing broiler eggs, feeding the breeding flock. At the time of this dispute, contract producers usually earned between $1.00 and $1.50 per breeding bird for the 30–40 week period in which the birds lay eggs. Independents had the possibility of earning $3.00 or more per breeding bird.

The antitrust claimants in this action are producers of broiler eggs. At the time this suit was filed, they resided in Franklin, Hart, and Elbert counties, which are located in northeastern Georgia. Their personal history mirrors that of the industry in general. The two who have been in the business the longest started out as independents but switched over to contract arrangements in the early 1960s. A third, who is a more recent entrant to the business, began as a contract producer in 1966. The reason the producers joined the integrated firms as contract producers was because they could find no hatcheries willing to guarantee them a market for the broiler eggs they produced. No producer would take on a breeding flock without a prior agreement from a hatchery because the risk of a catastrophic loss due to lack of an appropriate egg market was too great.

In 1967 and 1968, the poultry industry in the producers' area entered into a prolonged slump. Suddenly, contract arrangements were not available. This was the situation when Spartan, an independent feed merchant, offered the program which is the subject of the present litigation. Basically, Spartan offered producers breeding flocks and, most importantly, a guaranteed market for their eggs in return for the producer's promise to feed Spartan grain. Spartan assured producers its grain prices would be competitive. Spartan's program was popular with producers for two reasons: first, it gave them a chance to stay in business; and second, it was structured so that they could operate as independents instead of as contract producers.

Spartan was bucking industry trends by attempting to create by contract what other firms had accomplished by integration. Several large hatcheries in Pennsylvania, Ohio, and Maryland were recruited by Spartan as outlets for broiler eggs. In return for Spartan's promise to provide a fixed supply of eggs, the hatcheries promised to give Spartan a fixed price for the eggs. Spartan, in turn, wrote approximately the same price into the producers' contracts. Thus, Spartan served as essentially a costless middleman for the producers and hatcheries. Spartan instituted this arrangement to stem the erosion of its share of the feed market to the integrated firms.

By 1972, Spartan closed down this program. It claims that lack of profitability and difficulty in securing hatchery commitments caused the program's demise. In November, 1972, Spartan filed suit against producers, Ayers, Blackmon, and Meaders for the unpaid balances on their feed accounts. The producers counterclaimed asserting a violation of the antitrust laws. These claims were severed for a later trial. The fourth producer, Acker, filed an independent antitrust suit against Spartan. The two antitrust suits were consolidated for trial. At trial, the producers won a directed verdict on liability and only the issue of damages was sent to the jury.

Spartan appealed to the former Fifth Circuit. That Court defined the antitrust issue as whether Spartan's program constituted a *per se* illegal tying arrangement under section one of the Sherman Act, 15 U.S.C.A. § 1. *Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419, 425, 428 (5th Cir. 1978), *cert. denied*, 444 U.S. 831, 100 S.Ct. 59, 62 L.Ed.2d 39 (1979) (*Spartan I*). In the typical tying arrangement, a seller conditions the sale of one product (the tying product) on the purchase of another product (the tied product). *Northern Pacific Railway Co. v. United States*, 356 U.S. 1,

5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Although the present situation is not typical in that Spartan tied a requirement to buy feed to its promise to purchase eggs, the court held that this arrangement was sufficiently analogous to a tie-in that it should be analyzed under tying doctrine. *Spartan I*, 581 F.2d at 425. That ruling is not in dispute. The central issue under tying doctrine analysis is the extent of Spartan's economic power. Controlling on this point is the Supreme Court decision in *United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (*Fortner II*), which was decided subsequent to the first trial. The *Spartan I* court held that the producers had not established economic power as a matter of law so that a directed verdict of liability was improper. The case was remanded for a second trial, however, to give the producers an opportunity to meet factually the *Fortner II* standards.

At the second trial, both sides relied on expert and industry witnesses to support their positions on economic power. All of the witnesses agreed that in the long run the integrated firms were the most efficient system for producing broiler chickens. The producers' expert asserted, however, that in the short run, an independent feed mill like Spartan, would have a structural advantage over the integrated firms when the broiler industry as a whole was losing money. This advantage was derived from the relative lack of overhead an independent possessed as compared to an integrated firm. Evidence was produced that the broiler industry was in an economic slump during the period Spartan instituted its tying arrangement. The producers also brought out through testimony and stipulations evidence which showed that Spartan charged substantially above the market rate for its feed and that Spartan discriminated in its pricing policy between different producers.

Spartan's expert testified that any of the integrated firms in north Georgia could have offered a program similar to Spartan's and made a reasonable profit at it. Spartan produced numerous representatives from integrated firms in north Georgia who testified that not only could they have set up a program like Spartan's but they could have done it cheaper. They added that they had not followed that course because it was not economically attractive.

The trial court sent two special interrogatories to the jury on the issue of economic power. The court instructed the jury that an affirmative answer to either question represented a finding that Spartan possessed "appreciable economic power." The interrogatories read:

(A) As to the (1) purchase and (2) sale or usage of hatching eggs [was] Spartan Grain & Mill Company's overall arrangement with eastern hatcheries to buy all hatching eggs at the same price Spartan Grain & Mill Company was paying producers, an economic advantage that Spartan Grain & Mill Company had over its competitors?

(B) Was Spartan Grain & Mill Company in the Royston area able to offer a guaranteed price for hatching eggs during the life of the flock at a time when its competitors under conditions then existing could not have offered an equivalent guaranteed price if they had elected to do so?

Amplifying the second interrogatory, the court instructed the jury that the word "could" referred "to reality, to actuality, as compared to a theoretical possibility."

The jury answered "yes" to the first interrogatory and "no" to the second. Based on this finding of fact, the court entered judgment for the producers. Spartan appeals contesting the relevance of the first interrogatory to the issue of economic power and asserting that the jury's answer to the second interrogatory conclusively resolves the issue of economic power in its favor. We are asked today to decide what factors constitute proof of economic power. Spartan contends there is only one factor, cost advantage. The producers argue that cost advantage is only one of several factors. These other factors are price discrim-

ination, burdensome pricing, and production of an unmatchable differentiated product.

■ Tying arrangements are *per se* violations of section one of the Sherman Act if "a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product...." *Northern Pacific,* 356 U.S. at 6, 78 S.Ct. at 518; *see Jefferson Parish Hospital District No. 2 v. Hyde,* — U.S. —, 104 S.Ct. 1551, 1558–1561, 80 L.Ed.2d 2 (1984). The Supreme Court in *Fortner II* discussed the issue of economic power at length. The Court defined the inquiry into economic power in a tying case as "whether the seller has some advantage not shared by his competitors in the market for the tying product." *Fortner II,* 429 U.S. at 620, 97 S.Ct. at 867. Three types of advantages were noted by the Court: "legal, as in the case of patented and copyrighted products, ... physical, as when the product is land, ... [or] economic, as when competitors are simply unable to produce the distinctive product profitably...." *Id.* at 621, 97 S.Ct. at 868 (quoting *Fortner Enterprises, Inc. v. United States Steel,* 394 U.S. 495, 505 n. 2, 89 S.Ct. 1252, 1259 n. 2, 22 L.Ed.2d 495 (1969)) (cites omitted). The Court explained that economic advantage "is not the product itself but rather the seller's cost advantage in producing it." *Id.* Without a showing of cost advantage, according to the Court, there could be no finding of economic power under a theory of economic advantage. 429 U.S. at 622, 97 S.Ct. at 868.

*Fortner II* involved an asserted economic advantage, as does the instant case. The tie-in there was between homes and credit. U.S. Steel had tied credit arrangements to the sale of prefabricated houses. In evaluating the proof on the question of economic power, the Court's entire focus was on whether plaintiff, a disgruntled housing developer, had shown that the tying arrangement was predicated on a cost advantage U.S. Steel had in the tying product market. All of plaintiff's proof was rejected as not probative of cost advantage. The Court thought the most plaintiff had shown was that U.S. Steel had offered a highly competitive package deal.

The amalgam of factors asserted by the producers to be just as relevant as cost advantage to the question of economic advantage were mentioned by the Court in *Fortner II.* But it is clear that the Court thought them relevant only to the extent that they were probative of cost advantage. The producers have confused the evidentiary facts with the ultimate fact.

■ In the instant case, Spartan tied the purchase of grain to a guaranteed market for eggs. *Fortner II* dictates that the issue on which Spartan's antitrust liability turns is whether Spartan had a cost advantage in the tying product market. Since Spartan's tying product was a guaranteed market for eggs, the key factual inquiry should have been directed at Spartan's economic ability *vis-a-vis* its competitors to provide a market for eggs.

■ When the special interrogatories are examined in light of this analysis, the first must be rejected as irrelevant to the question of economic advantage. The first interrogatory asked whether Spartan's arrangement with the eastern hatcheries to purchase broiler eggs was an economic advantage. In phrasing the interrogatory in that manner, the district court focused attention on the economic advantage of the tying product instead of on Spartan's economic advantage in securing the tying product. The Supreme Court cautioned against exactly this misstep in *Fortner II:* economic power when measured strictly by economic advantage is "somewhat confusing since the real source of economic power is not the product itself but rather the seller's cost advantage in producing it." *Fortner II,* 429 U.S. at 621, 97 S.Ct. at 868. The district court's entry of judgment on the basis of the answer to the first interrogatory was error.

The question remains whether a third trial is appropriate. The answer in favor of Spartan on the second interrogatory is conclusive on the issue of economic power.

Judgment should be entered for Spartan. The second interrogatory asked whether Spartan was able to supply a guaranteed market for eggs at a price its competitors could not meet. The court instructed the jury that the word "could" must be viewed realistically. The second interrogatory read in light of this instruction is more than adequate on the issue of cost advantage. It actually is weighted strongly in the producers' favor. What the interrogatory required in order for the jury to find no cost advantage was that Spartan's competitors be able to make a reasonable profit using Spartan's program when in fact, Spartan should have been only required to show that its competitors would have made no less of a return or lost no more than Spartan. That the jury answered this interrogatory in Spartan's favor resolves the question of Spartan's economic power.

Since judgment should have been entered for Spartan, the producers' attorney's fees award must be reversed. 15 U.S.C.A. § 15; *See De Filippo v. Ford Motor Co.*, 516 F.2d 1313, 1321 (3d Cir.1975), *cert. denied*, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975).

REVERSED and RENDERED.