Warren **WEISBERG** as Partner, d/b/a
Consolidated Chemical Works,
Plaintiff-Appellant,

v.

**HANDY & HARMAN,**
Defendant-Appellee.

No. 83–1731.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 22, 1984.

Decided Oct. 30, 1984.

Michael P. Myers, Chicago, Ill., for plaintiff-appellant.

Ronald W. Teeple, Bergstrom, Davis & Teeple, Chicago, Ill., for defendant-appellee.

* The Honorable J. Smith Henley, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

1. Lydia Weisberg, who was a general partner of Consolidated when the complaint was filed, died before trial. The complaint was amended

Before CUMMINGS, Chief Judge, COFFEY, Circuit Judge, and HENLEY, Senior Circuit Judge.*

COFFEY, Circuit Judge.

Plaintiff-appellant Weisberg challenges the district court's determination of the dollar value (price) the plaintiff was entitled to receive for a shipment of silver under an open price contract. We affirm in part and reverse in part.

## I.

The appellant, Warren Weisberg, is the managing agent and sole proprietor[1] of Consolidated Chemical Works, an Illinois corporation that produces detergent products and cleaning compounds. The defendant, Handy & Harman, is a New York corporation with headquarters in New York City. H & H has sales offices at various locations, including Elk Grove Village, Illinois. Handy & Harman manufactures both precious and non-precious metal products and provides refining services. As part of its refining operation, H & H, for a fee, recovers precious metals from waste and scrap generated by users of H & H products. Precious metal resulting from the refining process is either purchased by H & H for its own use or an equivalent amount of metal is returned to the customer. Handy & Harman does not attempt to profit or speculate on price fluctuations in precious metals such as silver. It "zeroes out" its position each day by arranging for its sales and purchases of precious metals to offset one another.

In 1971, the plaintiff's father, who is now deceased, purchased 1,622.3 ounces of sterling silver from H & H planning to use the silver to heat-seal packages of cleaning materials produced by Consolidated. Later, the company decided to use premachined

to show that Warren Weisberg was the sole plaintiff due to the death of the other plaintiff. For purposes of clarity, we will refer to the plaintiff as Weisberg, rather than Consolidated Chemical, in this opinion.

copper in the heat-sealing process and stored the silver in the original H & H shipping crates.

Weisberg, who had assumed control of Consolidated after his father's death in 1975, decided to dispose of the silver in October of 1979. Weisberg, who had not participated in the prior transactions in the purchase or sale of precious metals, telephoned Handy & Harman's Elk Grove Village, Illinois office and spoke with Joan Johnson who explained to him Handy & Harman's charges in connection with its processing of the materials. Neither the price to be paid by H & H for the silver nor the date on which the price was to be fixed was discussed by the parties. According to testimony given at trial, Weisberg assumed that the transaction would be conducted in accordance with Handy & Harman's normal procedures. When a transaction is conducted under Handy & Harman's normal procedure, the receiving refinery determines the silver content of the metal and notifies Handy & Harman's New York office which in turn determines the total price to be paid by multiplying the amount of silver by the market price on that day. This calculation ordinarily is performed within two days after the refinery determines the fine metal content of the material submitted. At the time Weisberg delivered the silver to H & H, the normal processing time was four to six weeks.

On October 24, 1979, Weisberg delivered 1,622.3 ounces of sterling[2] to Handy & Harman's Elk Grove facility. On that day the market price of silver was $17.25. In November or early December of 1979, near the approximate time the silver normally would have been processed, Weisberg called Handy & Harman's Elk Grove Village office and asked Joan Johnson whether his silver had been processed. Johnson advised Weisberg that the normal time for smelting was four to six weeks. However, Johnson also informed Weisberg during this conversation that there was a strike at the refineries, and that there would be a delay in the normal smelting time. Weisberg did not complain about the strike delay. Johnson said that H & H would contact Weisberg in a week or two. On December 3, 1979, the market price of silver reached its highest level since the October 24th delivery of the silver, $19.84 per troy ounce.

Sometime after December 17, 1979, Handy & Harman temporarily lost track of Weisberg's shipment of silver. According to an affidavit of an H & H employee submitted at trial, this loss was caused by the confusion created by the strike. During the latter part of December of 1979, Joan Johnson contacted Ken Fagan, an employee in H & H's New York office and asked him to locate Weisberg's silver lot. Fagan made a series of telephone inquiries to the refinery and ascertained that neither the silver nor the paperwork could be found. Fagan was also unable to locate the paperwork relating to the lot in the New York office. In the course of six to eight weeks, Fagan notified Joan Johnson on several occasions that his efforts to locate the lot had been fruitless. The silver was eventually found sometime thereafter in March of 1980.

After Handy & Harman failed to contact him, Weisberg telephoned the Elk Grove Village office before Christmas of 1979 and requested of Joan Johnson information concerning the overdue payment. Johnson told Weisberg that she had asked a man in New York, Ken Fagan, to determine when Weisberg's silver would be processed. During that conversation, Johnson informed Weisberg that the price Weisberg would receive was the price of the precious metals at the time of smelting. Although Johnson told Weisberg that someone from H & H would contact him shortly, Weisberg was not contacted by H & H during the month of December. On December 28, the last trading day in 1979, the market

---

**2.** Sterling is 92.5 per cent fine silver, so the actual quantity of fine silver involved in this litigation is approximately 1,500 ounces.

price of silver reached $28.00 per troy ounce.

On January 2, 1980, the first day of trading in 1980, the price of silver escalated to $37.75. On January 3, 1980, Weisberg sent the following mailgram to H & H's main office in New York:

"October 24 1979 we delivered 1622.3 troy ounces sterling silver to your Elk Grove Village office. Desire to sell at present market. Send confirmation and settlement check to Consolidated Chemical Works 1713 South Halsted St Chicago IL 60608 Attention Warren B Weisberg."

On the date of the mailgram, the price of silver was $38.40.

A week to ten days after sending the mailgram, Weisberg called and spoke to Joan Johnson once more. She assured Weisberg that Ken Fagan in New York was aware that Weisberg's silver had not been processed in the normal time period and was trying to determine when Weisberg's silver would be processed. Johnson again promised Weisberg that Handy & Harman would be in contact with him. Weisberg told Johnson that he "would like things to get over with, come to a head." Weisberg later testified at trial that he could not recall whether the mailgram was discussed during that conversation. At the time of the conversation the price of silver was over $40.00.

On March 27, 1980, Weisberg's lawyer wrote to H & H stating that when Weisberg delivered the silver to H & H on October 24, 1979, Weisberg had been promised by H & H that the metal would be processed "within four to six weeks." The letter also noted that Weisberg had sent the mailgram on January 3 requesting sale on that date and demanded payment at the January 3, 1980 price. Sometime in early April, Handy & Harman offered to pay Weisberg $19.84 per troy ounce, the highest market price of silver prevailing during the four to six week period following the October 24th delivery date. Plaintiffs rejected the offer and filed suit on May 9, 1980. Thereafter, on June 22, 1980, H & H sent Weisberg a check in the amount of $29,555.56. Weisberg did not deposit the check.

At trial, Weisberg testified that when he contacted H & H, he believed that H & H would handle his silver delivery in accordance with its normal procedures. Concerning the mailgram, an employee of H & H testified that, after thoroughly searching the files in the New York office and the mailroom log in which employees recorded items received from Western Union, he was unable to find any record of Handy & Harman's receiving the January 3 mailgram. According to the employee, he would have made an off-setting sale of silver to "zero out" H & H's position on that date if the mailgram had come to his attention.

The district court found that at the time Weisberg delivered the silver to H & H, it was the intent of both parties that the transaction be governed by H & H's past practices and procedures. The court held that, under normal circumstances, the price of the silver would have been fixed within four to six weeks from the date of delivery. The court further determined that the transaction did not occur in the normal time period because of the defendant's misplacement of the plaintiff's silver and the strike. According to the district court's findings, the strike was a fortuitous circumstance which should not affect the amount the plaintiff was entitled to under the contract because the defendant should not be held responsible and penalized for a strike which it did not cause. The court also held that, although the loss of the lot was caused by the defendant's negligence, the negligence was without legal significance since the delay did not deprive the plaintiff of the benefit of his oral contract, the price available four to six weeks after delivery. The court further resolved that the plaintiff did in fact send the mailgram, but that the defendant had fulfilled its burden of establishing that it did not receive the mailgram. Furthermore, the court ruled that Section 2–305(3) of the

Uniform Commercial Code[3] did not apply and, therefore, the plaintiff's mailgram would not have had an effect on the pricing date even had it been received. The court ruled that the plaintiff was entitled to recover the maximum price of silver reached during the four- to six-week period after delivery—the time frame within which the price normally would have been established. The court denied prejudgment interest from December 5, 1979 until April of 1980 when H & H made its offer of settlement and awarded the plaintiff $29,555.56, the amount offered by H & H, less refining costs.

## II.

■ Plaintiff argues that the district court erred when it held that Section 2–305(3) of the Uniform Commercial Code was not applicable to this transaction. U.C.C. 2–305(3) provides:

> "When a price *left to be fixed otherwise than by agreement of the parties* fails to be fixed through fault of one party the other may at his option treat the contract as cancelled or himself fix a reasonable price."

Ill.Ann.Stat. ch. 26, § 2–305(3) (Smith-Hurd 1963) (emphasis added). It is evident from the language of the subsection that subsection 2–305(3) will not apply when the contract provides either that the price is to be fixed by mutual agreement or the price is to be fixed by one of the parties. Subsection 2–305(3) applies when some action is required by the parties to enable a third party or external agency to set the price in accordance with the agreement. 2 Hawkland, Uniform Commercial Code Series, § 2–305:03; Section 2–305, Illinois Code Comment Subsection (3) ("This subsection continues the policy of USA § 10(2), which gave the aggrieved party recourse against the other party who wrongfully prevented a *third party* from determining the price.") (emphasis added). The Uniform Commer-

cial Code distinguishes between contracts in which the parties set the price in contrast to contracts in which a third party sets the price because of administrative convenience; it is easier to establish that a party failed to cooperate than it is to prove that a party failed to bargain in good faith. Hawkland, *supra*, at 2–305:03. The contract between Weisberg and H & H never intended that a third party or external agency set the price. Rather, the contract called for Handy & Harman to set the price after determining the silver content of the metal by paying Weisberg the market price of the silver on the date the silver content was determined. Thus, the focus of any inquiry into the contract should be whether Handy & Harman acted in good faith under § 2–305(2), not on whether Handy & Harman cooperated with a third party. Appellant's argument that subsection 2–305(3) should apply, therefore is without merit because the contract between Weisberg and H & H called for H & H rather than a third party, to set the price.

■ An additional consideration is whether Weisberg effectively modified the contract by sending the mailgram on January 3rd. Because the mailgram attempted to secure the January 3rd price, rather than the price that would have been received had the terms of the original contract been timely fulfilled, it may be treated as an attempt to modify the contract under § 2–209. An initial inquiry is whether Weisberg acted in good faith in attempting to modify the contract since the Uniform Commercial Code imposes an obligation on parties who modify their contracts to act in good faith. Section 2–209 Uniform Commercial Code, Comment 2. A precipitous change in market price satisfies the requirement of good faith found in § 2–209. *Id.* Furthermore, Handy & Harman employees testified that, if H & H had received the mailgram, they would

---

3. "When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through fault of one party the other may at his option treat the contract as cancelled or himself fix a reasonable price."

Ill.Ann.Stat. ch. 26, § 2–305(3) (Smith-Hurd 1963).

have given Weisberg the January 3rd price and would have made an off-setting sale. Handy & Harman's argument that Weisberg unfairly attempted to gain a "windfall" therefore is without merit because the attempt to modify, by selecting a pricing date (which H & H normally honored), was prompted by a precipitous market change. To answer the question of whether the mailgram modified the contract, we must determine whether the district court was correct in finding that the defendant did not receive the plaintiff's mailgram. Illinois courts employ a presumption that "a letter,[4] properly addressed and with proper postage is presumed received by the addressee in due course. Denial of receipt by [the] addressee, however rebuts the presumption, in which case the issue becomes a question of fact to be decided by the trier of fact." *Liquorama v. American Nat. Bank & Trust*, 86 Ill.App.3d 974, 41 Ill. Dec. 951, 953, 408 N.E.2d 373, 375 (1980). Findings of fact shall not be set aside unless they are clearly erroneous. Fed.R. Civ.P. 52(a). The Plaintiff met his burden of proof in establishing that he sent the mailgram by producing the confirmation copy. However, testimony and evidence at trial established that the mailgram addressed to Handy & *Herman,* and sent to an executive office with 225 employees (divided into nine or ten separate departments), was not directed to any particular person's attention even though Joan Johnson had informed Weisberg that Ken Fagan was the person in the New York office in charge of locating Weisberg's lost silver. Furthermore, the plaintiff testified that he failed to refer in the mailgram to the identification numbers assigned to his lot. Additionally, an employee of H & H stated that he had thoroughly searched the files of H & H and had found no record of the mailgram having been received. Finally, H & H did not make an off-setting sale. Because a Handy & Harman employee had

testified that it was Handy & Harman's customary practice to allow customers to pick a pricing date and for H & H to make an off-setting sale when the customer picked a pricing date, the district court concluded that, "it is highly likely that the defendant would have acted quickly to minimize its losses" if it had received the mailgram. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made. *United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), *reaffirmed in Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 855, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982). We hold there is ample support in this record for the district court's finding that H & H did not receive the mailgram and, since H & H did not receive Weisberg's mailgram that attempted to modify the contract, the plaintiff's legal argument of attempted modification must fail.

■ The third issue is whether the district court erred when it held that the plaintiff was entitled to recover the maximum price of silver reached during the period from four to six weeks after delivery. The Uniform Commercial Code directs that, "when the price is left to be agreed by the parties and they fail to agree ... the price is a reasonable price at the time for delivery." Ill.Ann.Stat. ch. 26, § 2–305(1)(b) (Smith-Hurd 1963). The district court found that, at the time they entered into the contract, the parties intended the transaction to be governed by H & H's past practices and procedures. Thus, if the contract had been performed as the parties originally intended, the price of the silver would have been fixed within four to six weeks from the date of delivery. Because the district court was unable to determine

---

**4.** A mailgram is a telegram-type message delivered by the postal service. Western Union transmits the message to its office in the city of destination where the message is typed on Western Union stationery and deposited in the local mail. The message should arrive the day after it is given to Western Union. Because delivery of the message depends upon the Postal Service, a mailgram is similar to sending a message through the mail. For this reason, we rely on Illinois case law dealing with the sending of messages through the mail.

precisely when during the four- to six-week period the price would have been fixed, the district court awarded the plaintiff the highest market price the precious metal reached during the six weeks after delivery. Because the price chosen by the district court, to which H & H does not object is the highest possible amount that Weisberg could have received if the contract had been performed as the parties originally intended, we can only conclude that the price set by the district court was reasonable. We affirm the award of $19.84 per troy ounce less smelting costs to the plaintiff.

■ Our final inquiry is whether the district court erred in denying prejudgment interest between the date of December 5, 1979, the date the district court estimated as the date when Handy & Harman would normally have performed, until the date in April of 1980, when H & H made an offer of settlement.[5] In Illinois, a party may receive prejudgment interest "on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance." Ill. Rev.Stat. ch. 17 § 6402 (Smith-Hurd 1981). For interest to attach prior to judgment absent an agreement the amount must be fixed or determinable and due in the sense that a debtor-creditor relationship has come into being. *Madison Park Bank v. Field,* 64 Ill.App.3d 838, 21 Ill.Dec. 583, 587, 381 N.E.2d 1030, 1034 (1978). In the case at hand, a debtor-creditor relationship came into being and the amount due Weisberg was determinable on the date when H & H normally would have determined the silver content of the metal; thus, Weisberg is entitled to prejudgment interest. The court found that Weisberg had waived his right to receive payment at the time when H & H normally would have paid him for

the silver because he "made no offer to settle for that amount, made no demand to settle for the amount, and, in fact, during much of that time was making no complaint at all that would have alerted defendant to the fact that there was going to be a dispute about price." The Illinois courts have determined that "parties to a contract may waive any provisions in the contract and that such waiver can be demonstrated by conduct indicating that strict compliance with the provisions of a contract will not be required." *Botti v. Avenue Bank & Trust,* 103 Ill.App.3d 1052, 59 Ill.Dec. 711, 713, 432 N.E.2d 295, 297 (1982). When Weisberg entered into the contract with Handy and Harman, he expected to be paid within four to six weeks. While the district court focused on the amount of money Weisberg anticipated receiving, it overlooked the second element of the contract: specifically, that Weisberg had every reason to believe that he would have the use of the money within that four- to six-week period. We must, therefore, examine his actions during this period to see if he waived his right to timely payment. Some time before Christmas he phoned Joan Johnson to inquire about the status of his lot of silver. On January 3rd he sent the mailgram stating, "Desire to sell at present market." One week to ten days later he again phoned Johnson and stated that he "would like things to get over with, come to a head." A few days later he phoned Johnson once more to ask why he had not been contacted by H & H. Finally, on March 27th he wrote Handy & Harman demanding payment. Thus, the record is replete with evidence of Weisberg continuously pressing Handy & Harman for payment. We hold that the district court's finding of waiver is not supported by the evidence.

---

5. Weisberg's argument that he fixed the price when he called Joan Johnson a week to ten days after the mailgram and told her that he was "a little concerned" and "expressed an opinion that I would like things to get over with, come to a head" was not advanced in the district court. Weisberg is precluded from arguing a new theory of recovery for the first time on appeal. *Avern Trust v. Clarke,* 415 F.2d 1238, 1240 (7th

Cir.1969), *cert. denied,* 397 U.S. 963, 90 S.Ct. 997, 25 L.Ed.2d 255 (1970).

Weisberg also argues that a provision in Handy & Harman's forms give Weisberg the right to interest. A reading of the entire form reveals that the provision applies to H & H when it sells precious metal products that it fabricates. The argument is without merit.

We reverse the court's decision dealing with the award of interest and remand for a determination of the amount of interest the plaintiff was entitled to from December 5th to that date in early April when Handy & Harman made its offer to settle.

This case is AFFIRMED in part, REVERSED in part, and REMANDED to the district court for further determination consistent with the mandate contained in this opinion.