**OFFICES TOGOLAIS DES PHOSPHATES, a company owned by TOGO, a country in West Africa, Plaintiff,**

v.

**MULBERRY PHOSPHATES, INC., a Virginia corporation, Defendant.**

No. 97–1736–CIV–T23C.

United States District Court,
M.D. Florida,
Tampa Division.

May 19, 1999.

Order Denying Motion to Amend
July 7, 1999.

Robert D. Gatton, Broad & Cassel, Orlando, FL, for Offices Togolais Des Phosphates, a company owned by Togo, a country in West Africa, plaintiff.

Robert Sims Bolt, Barnett, Bolt, Kirkwood & Long, Tampa, FL, Charles Allen Carlson, Barnett Bolt Kirkwood & Long, Tampa, FL, for Mulberry Phosphates, a Virginia corporation, defendant.

Robert Sims Bolt, Barnett, Bolt, Kirkwood & Long, Tampa, FL, Charles Allen Carlson, Barnett Bolt Kirkwood & Long, Tampa, FL, for Mulberry Phosphates, counter-claimant.

Robert D. Gatton, Broad & Cassel, Orlando, FL, for Offices Togolais Des Phosphates, counter-defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JENKINS, United States Magistrate Judge.

This case was tried on March 9–12, 1999.[1] The court has reviewed the parties'

various submissions, the evidence and testimony presented at the hearing, as well as portions of the designated depositions. Pursuant to Rule 52, Federal Rules of Civil Procedure, the following findings of fact and conclusions of law are entered.

## FINDINGS OF FACT

1. Plaintiff/counterdefendant ("Plaintiff") Offices Togolais Des Phosphates ("OTP") is a phosphate rock mining company located in and owned by Togo, a small country in West Africa.

2. Defendant/counterplaintiff ("defendant") Mulberry Phosphates, Inc., ("MPI") is a Virginia corporation which operates a phosphate rock processing plant in Mulberry, Polk County, Florida, within the Middle District of Florida.

3. The central Florida region produces a large supply of phosphate which is sold within and outside the United States.

4. MPI is a wholly owned subsidiary of Mulberry Corporation, a Delaware corporation.

5. OTP mines, processes, and sells phosphate. It was nationalized by the government of Togo in 1974.

6. Phosphate rock is used to produce ammonium phosphate, including Diammonium Phosphate (DAP), which is used in fertilizer.

7. Togo phosphate and Florida phosphate have different characteristics.

8. Togo rock is very fine in consistency and has a higher percentage of "Bone Phosphate of Lime" (BPL) which makes it more valuable for fertilizer production. However, the Togo rock mined and processed by OTP has a much higher chloride content as well as high cadmium levels.[2] The high chloride content is caused by the two-stage benefication process employed by OTP. Benefication is the process by which clay and other impurities are removed from the phosphate rock. The rock is initially washed with saltwater and then rinsed with "soft" (fresh) water. The saltwater rinse creates the higher chloride content.

9. Several European countries regulate the cadmium content of fertilizer. Over the past ten years or so, this has had an adverse impact on OTP's sale of Togo rock in Europe. In the U.S., cadmium content of fertilizer is not regulated.

10. Togo rock is very fine in texture and does not need to be ground before processing. Florida rock, on the other hand, has a pebbly consistency and must be ground during processing before it can be made into fertilizer. Florida phosphate rock also has a lower BPL which makes it less valuable to fertilizer manufacturers who must meet certain BPL levels for fertilizer. As a general rule, Togo phosphate rock has a BPL content of 80 and Florida phosphate rock has a BPL content of 68.

11. Ekoue Glikou ("Glikou") was the General Manager of OTP from March 1993 until approximately December 21, 1995 when he was replaced by Kpanlou Patasse ("Patasse"). Thereafter, Glikou remained employed by OTP but in a position subordinate to that which he had held previously.

12. Judas Azuelos ("Azuelos") is the Chairman of the Board of Directors of MPI and he also owns a controlling interest in Mulberry Corporation, MPI's parent company.

13. Azuelos served as a consultant to OTP for a number of years. He was hired by Togo in 1973 to assist with its phosphate mining industry. During this time, the government of Togo established OTP

---

1. The parties have consented to proceed before the Magistrate Judge pursuant to Title 28, United States Code, Section 636(c) and Fed.R.Civ.P. 73.

2. Togo rock typically contains 600 ppm of chloride. Florida rock typically contains 50 ppm of chloride.

as the government owned operating company for the Togo phosphate industry. Azuelos became well-acquainted with Glikou and other OTP officials during the years he served as consultant.

14. Azuelos oversaw OTP's marketing effort for a number of years during which time OTP's annual sales increased significantly. Also, as European regulation of cadmium in phosphate rock and its byproducts began to have an adverse impact on Togo's rock exports, Azuelos helped OTP secure new clients, including Esso Chemical, (now known as Sherritt Chemical), in Alberta, Canada. At the present time, Sherritt purchases more phosphate from OTP than any of OTP's other customers (about a million metric tons per year). It pays approximately $32 per metric ton for the Togo phosphate.[3]

15. The government of Togo conferred an award on Azuelos in April 1986 in recognition of his contributions to the phosphate industry in that country.

16. When Azuelos became Chairman of the Board of MPI in 1987, he ceased his formal consulting relationship with OTP. However, he continued to stay in touch with officers of the company and to encourage OTP's efforts to market its phosphate.

17. In early 1995, Glikou visited Paris and met with Azuelos at his residence. During their discussions, Azuelos mentioned the possibility of purchasing a trial shipment of Togo rock for processing at the Mulberry plant. At that time, MPI purchased all of the rock for its processing plant from Mobil Manufacturing & Minerals Company ("Mobil"), a central Florida company. OTP has also sold phosphate to a company located in the Gulf Coast region of the U.S.

18. At the Paris meeting, Glikou did not think that Azuelos was that serious about purchasing Togo rock and they had no further discussions until September 1995 when they encountered each other at a meeting of the Fertilizer Institute in Chicago. On that occasion, Azuelos indicated that he wanted to purchase at least one trial shipment of Togo phosphate as he felt it could be used to enhance the BPL content of the Florida phosphate processed by MPI and sold as DAP.

19. At the time of the Chicago meeting, Azuelos was aware of negotiations by Cargill to purchase certain central Florida phosphate rock mines owned by Mobil. If the sale occurred, it could adversely impact MPI's source of supply because Cargill also processed phosphate rock. Although MPI owned or controlled three phosphate mines in central Florida, only one was in operation. Reopening a mine required substantial start-up costs and several months' time.[4]

20. Azuelos told Glikou that MPI needed the trial shipment of Togo phosphate by November 18th before the annual "turnaround" of the Mulberry plant in December of 1995 when MPI shut down its plant for annual repairs. Glikou agreed to arrange for the shipment by that date.

21. Glikou and Azuelos did not discuss the price of the trial shipment or the cost of shipping the rock from Togo to Tampa, the port closest to Mulberry, and who would pay the freight. However, both men were generally aware of the pricing factors which their companies considered in deciding to buy or sell phosphate rock.

---

**3.** The evidence at trial does not indicate whether this includes the cost of shipping the phosphate from Togo to Canada.

**4.** During the fall of 1995, as the proposed sale to Cargill became a reality, MPI and Cargill entered into negotiations concerning the sale of phosphate rock. Mobil's contract with MPI ran from year to year. Cargill insisted that MPI agree to purchase phosphate rock from Cargill and no other producer. In September of 1995, Cargill initially offered to deliver phosphate to MPI's Mulberry plant for $27.25 per short ton for the first year of the five year contract. In February of 1996, MPI and Cargill entered into a five-year contract which required that MPI purchase all of its phosphate rock from Cargill at a price of $27.00 per short ton.

Neither Azuelos nor Glikou discussed sharing of costs at either the Paris or Chicago meeting preceding MPI's receipt of the Togo phosphate.

22. OTP generally required a customer to have a letter of credit in place before shipping phosphate. It did not require this of MPI, due to the long-standing relationship between Azuelos and OTP. OTP always had an agreement as to price before sending a trial shipment; this instance was a departure from that policy, also due to the special relationship with Azuelos and his request that the Togo phosphate be received in November.

23. On or about September 21, 1995, MPI requested that OTP send it a two hundred (200) kilogram sample of Togo rock by airfreight so that Mulberry could process the rock in its laboratory prior to receiving the trial shipment. Such samples are also frequently provided to both new and old customers of OTP. The requested sample was ultimately shipped to Tampa, where it was received by MPI in mid-October.

24. After receiving the trial shipment, Al Castle ("Castle"), the plant manager, had it tested and analyzed. He immediately became alarmed about the high chloride content of the Togo rock which was approximately 600 parts per million. Castle concluded that the rock could not be processed by the Mulberry plant "as is" because it would corrode the machinery.[5]

25. Despite knowing the difficulties in handling the rock through its plant, especially after analyzing the sample of Togo rock, MPI never took any steps to advise OTP that it did not wish to receive the trial shipment.

26. After returning to Togo, Glikou located a ship to take a shipment of phosphate rock to Tampa so that it could be transported to Mulberry's plant. The first vessel he located could not guarantee arrival of the rock by the date required by MPI. Although OTP had a charter party agreement establishing a set rate for shipments of phosphate (approximately $11.75 per metric ton), it had to pay a higher freight rate—$14.50 per metric ton—to obtain a vessel which could deliver the Togo rock by the deadline set by MPI.

27. By letter dated October 24, 1995, OTP requested that MPI confirm acceptance of the vessel M/V "Destino" at twenty-two thousand five hundred/twenty three thousand (22,500/23,000) metric tons for delivery of Togo phosphate rock not later than November 18, 1995. The letter did not state the freight charges.

28. By letter dated October 24, 1995, MPI confirmed its intent to accept the shipment of Togo rock via the M/V "Destino" with an estimated time of arrival in Tampa, Florida between November 12 and 15, 1995, containing approximately twenty-two thousand five hundred (22,500) metric tons of phosphate rock, plus or minus ten percent (10%).

29. The parties subsequently agreed that the shipment would arrive in Tampa not later than November 18, 1995.

30. Glikou made efforts to contact Azuelos before the shipment arrived to finalize an agreement as to the price of the shipment but he was unsuccessful. Although Azuelos knew that MPI and OTP had not agreed on a price for the trial shipment of Togo rock, he made no attempt to contact Glikou.

31. On October 25, 1995, the ship M/V "Destino" left port in Togo with twenty-two thousand five hundred (22,500) metric tons of Togo phosphate aboard bound for Tampa, Florida.

32. By letter dated November 2, 1995, MPI requested OTP to send a "pro forma invoice" reflecting the value of the product

---

**5.** European plants which process African phosphate rock use a higher quality metal alloy in their equipment due to the high chloride content of that rock. In the United States, however, the phosphate processing plants use a lower quality alloy because the danger of corrosion is not present with Florida phosphate.

and the ocean freight, as required by U.S. Customs.

33. OTP initially responded to MPI's request by stating that "until now, Mr. GLIKOU our Directeur General, has not been able to contact Mr. AZUELOS, in order to negotiate price for the cargo."

34. Several days later, on November 10, 1995, OTP sent an invoice entitled "TRIAL SHIP FOR TEST" which showed the sale of the twenty-two thousand five hundred (22,500) metric tons of phosphate with a wastage of 168.75 metric tons for a net of 22,331.25 metric tons of phosphate. The unit price listed for the phosphate was $28.00 Free On Board (FOB), which reflected a $6.00 per metric ton discount for the trial shipment, plus freight of $14.50 for a total of $42.50 per metric ton. The total amount of the invoice was $949,-078.13, and required payment by transfer to an OTP account at a bank in Lome, which is the capital of Togo.

35. By letter dated November 14, 1995, MPI, through its plant manager, acknowledged receipt of the "pro forma invoice" and stated:

It is our understanding that the final invoice will be issued when Mr. Glikou and Mr. Azuelos confer and agree on a price.

36. On or about November 18, 1995, the 22,500 metric tons of Togo Phosphate rock arrived at the Port of Tampa aboard the ship M/V "Destino". MPI had the phosphate off-loaded, transported to a warehouse, and ultimately transported by truck to its plant in Mulberry for processing. MPI paid a total of $270,983 for these services and referred to them as "transportation expenses" at trial. However, the majority of these expenses did not involve transportation of the Togo rock to the Mulberry plant but involved the cost of storing it in warehouse units. Inside storage was required because of the fine texture of the Togo rock which made it susceptible to wastage. Florida phosphate did not require inside storage. Approxi-

mately $97,881 of this amount was attributable to the cost of transporting the rock by truck from the Port of Tampa to the Mulberry plant. Less than $3,000 went for a survey and preparation of customs paperwork. The balance—approximately $170,242—was the cost to store the Togo phosphate.

37. OTP sent Sami Segbeaya ("Segbeaya"), who was fluent in both English and French, to provide assistance to MPI in processing the Togo phosphate. OTP made it a general practice to offer such technical assistance to any customers who ordered a trial shipment of Togo rock.

38. Segbeaya arrived in Tampa on November 7, 1995 and remained at the Mulberry plant until November 22, 1995.

39. Upon arriving at Mulberry, Segbeaya was told that MPI had conducted tests on the sample rock using different mixtures of Togo phosphate with Florida phosphate to determine their corrosive effect on the machinery. As a result of the tests, MPI decided to wash the rock first to decrease the chloride content before it processed the Togo rock at the Mulberry plant. However, Segbeaya told MPI that washing the rock was not a good idea.

40. MPI acquired the necessary equipment, borrowing some of the equipment from one of its closed mines, and constructed a facility to wash the phosphate. MPI did not obtain OTP's approval to incur these expenses.

41. Despite concerns about processing the rock directly through the plant, MPI processed about one-half (½) of the Togo phosphate through its plant "as is" and used the other one-half (½) to blend with Florida phosphate rock. Using these methods, MPI produced about 12,000 tons of DAP. There is a material dispute in the evidence indicating what profits MPI made from the sale of the DAP but that dispute is not material to the proper resolution of the claims presented at trial.

42. The portion of the rock which was not washed caused corrosion to some of

the Mulberry plant's equipment, making it unusable for future processing, according to MPI.

43. In December 1995, Glikou traveled to Paris to meet with Azuelos. Azuelos told him about the difficulty MPI experienced in processing the Togo rock and requested that OTP share in some of the extraordinary costs incurred by MPI. Glikou, anxious to receive payment for the trial shipment by the end of the year, indicated that OTP would be receptive to this proposal "in principal" but needed to be provided detailed information concerning MPI's expenses. He indicated that the most he would be willing to consider would be an additional $2 to $3 per metric ton discount from the price stated in the pro forma invoice.

44. By letter to OTP dated December 20, 1995, via telefax, Stewart of MPI suggested a price of $32.09 per metric ton as the appropriate price for the 80 BPL Togo rock "delivered to our plant." Stewart based this figure on the fact that MPI paid Mobil an average of $27.28 per metric ton in 1995 for 68 BPL rock. Stewart's letter also detailed the costs incurred by MPI in unloading the vessel and transporting the Togo rock to the Mulberry plant which totaled $10.73 per short ton. Stewart did not suggest a final figure for the trial shipment but stated that MPI could not pay the "normal price for Togo rock" and that the "price must be in the range of availability from U.S. sources on a delivered basis." Azuelos testified that Stewart's letter intended to suggest a price of about $20 per metric ton for the trial shipment.

45. On December 21, 1995, Glikou was replaced by Kpanlou Patasse ("Patasse") as Managing Director of OTP.[6] MPI was notified of this action by letter dated December 22, 1995. After that point, Glikou

ceased all discussions with MPI about payment for the trial shipment of Togo rock.

46. On December 31, 1995, OTP, through Patasse, sent MPI an invoice in the amount of $1,083,065.63 for the trial shipment. Thereafter, OTP and MPI attempted, without success, to reach an agreement about the price of the trial shipment. There were no further discussions about price sharing.

47. On February 27, 1996, OTP sent a final demand letter to MPI requesting payment for the shipment of Togo rock at a price of $28.00 per metric ton FOB (reflecting a $6.00 per metric ton discount) for a total of $625,275, plus shipping charges of $326,250 for a total amount due of $951,525.00. OTP stated that the matter would be referred to its lawyer if payment was not received within 30 days.

48. As of the March 1999 trial, OTP had not been paid for the shipment of Togo rock which MPI had received in November 1995.

## CONCLUSIONS OF LAW

This court has jurisdiction over the subject matter of this action and the parties which is based on diversity of citizenship. *See* 28 U.S.C. § 1332(a)(2).

OTP brings a breach of contract claim to which MPI has asserted a counterclaim of breach of joint venture agreement.

■ The issue presented is whether the transaction between OTP and MPI was a contract for the sale of goods, with the sales price left undetermined, as OTP claims, or whether it was a joint venture in which the parties were both to absorb certain expenses, as MPI claims. Under MPI's joint venture theory, it owes OTP approximately $76,000 rather than the amount claimed by OTP.

6. Patasse testified that Glikou was not the only official to be affected by the position changes. He explained that it was time for OTP to make certain management changes because Glikou and others had been in their positions for three or four years. Nevertheless, Patasse expressed disapproval with the way Glikou had handled the trial shipment to MPI.

■ Under Florida law, a joint venture is a "special combination of two or more persons, who, in some specific venture, seek a profit jointly without the existence between them of any actual partnership, corporation, or other business entity." *Browning v. Peyton*, 918 F.2d 1516, 1520 (11th Cir.1990) (citing *Florida Tomato Packers, Inc. v. Wilson*, 296 So.2d 536, 539 (Fla.App. 3rd Dist.1974), *cert. denied*, 327 So.2d 32 (Fla.1976)).

■ A joint venture is created when two or more entities combine their property or time or a combination of the two to carry out a single business enterprise for profit. *Kislak v. Kreedian*, 95 So.2d 510, 514 (Fla. 1957).

■ An essential prerequisite to a joint venture agreement is a contract, express or implied. Additionally, the following elements must be shown: (1) a community of interest in the performance of a common purpose; (2) joint control or right of control; (3) a joint proprietary interest in the subject matter; (4) a right to share in the profits; and (5) a duty to share in any losses which may be sustained. *See Peyton*, 918 F.2d at 1520 (citing *Kislak*, 95 So.2d at 510).

■ The party alleging a joint venture has the burden of establishing it. *See Kislak*, 95 So.2d at 515. Where the joint venture is not in writing, the burden of establishing the existence of such a contract, including all of its essential elements, is a heavy and difficult one. *Id.*

■ There can be no joint venture without an agreement in which there is equal authority, and joint control or right of control. *See A.F. Pylant, Inc. v. Escambia Treating Co.*, 276 F.2d 919 (5th Cir.1960); *Kislak*, 95 So.2d at 515. Mutual control and intent to share losses as well as profits are essential elements in a joint venture. *See Green v. Putnam*, 93 So.2d 378, 380 (Fla.1957).

The preponderance of credible evidence does not support MPI's claim that the parties entered into a joint venture agreement rather than a contract for a sale of goods. First, none of the documentary evidence during the period prior to the shipment, including the written communications exchanged between the parties, makes any reference to a joint venture agreement. Under Florida law, MPI bears a heavy burden to establish a joint venture, in the absence of a written agreement. *See Kislak*, 95 So.2d at 515. The conversations between Glikou and Azuelos, the only parties to the negotiations, clearly contemplated that MPI would purchase a trial shipment of Togo rock from OTP to see if it could benefit MPI's operations. The only discussion about OTP absorbing some of MPI's expenses came in December 1995 after the Togo phosphate rock had been received and processed by MPI. This conversation, clearly an effort by both parties to reach an agreement concerning the price of the trial shipment, did not convert the transaction into a joint venture.

In addition, there was never any discussion between OTP and MPI at any time about sharing any profits, an integral part of any joint venture agreement. The witnesses who testified for MPI in support of the joint venture theory steadfastly denied any agreement to share with OTP the profits earned by MPI from the DAP that it manufactured from the Togo rock and contended that the two companies intended only to share in the costs incident to processing the Togo rock into DAP.

Finally, MPI exercised total control over the processing of Togo rock into DAP. OTP's engineer, Segbeaya, provided some assistance and advice while he was at the Mulberry plant in November 1995 but neither he nor any other OTP official exercised the right of joint control over the processing operation involving the Togo phosphate.

Rather than a joint venture, the transaction between OTP and MPI was fundamentally an oral agreement for the sale of goods with the price to be agreed to at a

later date. In view of the longstanding relationship between Azuelos of MPI and OTP, the fact that OTP did not require a letter of credit from MPI and a firm price prior to authorizing the trial shipment does not undermine OTP's claim that such an agreement existed.

Section 672.204(3), Florida Statutes, provides in part:

(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Section 672.305, Florida Statutes, provides:

(1) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if:

(a) Nothing is said as to price; or

(b) The price is left to be agreed by the parties and they fail to agree; or ...

(c) The price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

(2) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.[7]

Gaps are classified in one of two ways: partial gaps or complete gaps. *See* James J. White & Robert S. Summers, *Uniform Commercial Code,* § 3–8, at 149 (4th ed.1995). A partial gap exists where the parties have specified the manner in which the price is to be determined but the method fails. *See id.* § 3–8, at 147, 150. A complete gap exists where the parties have said nothing as to the price term. *See* Fla.Stat. § 672.305(1)(a); White & Summers, *supra,* § 3–8, at 149.

In this case, OTP and MPI never agreed on a price for OTP's shipment of Togo

rock to MPI or a methodology for determining the price. They also never agreed on the cost of shipping and who was to pay for shipping. Accordingly, this situation involves a complete gap rather than a partial gap.

In a complete gap case, the court "is on its own" in determining a reasonable price. *See* White & Summers, *supra,* § 3–8, at 150.

■ The court may look to several factors to ascertain reasonable price including evidence of the (1) course of performance, (2) usage of trade, and (3) the fair market value at the time and place of delivery. *See id. See also Havird Oil Co., Inc. v. Marathon Oil Co., Inc.,* 149 F.3d 283, 290 (4th Cir.1998) (reasonableness of price determined from market price); *TCP Indus., Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 549 (6th Cir.1981) (reasonable price and market price may not be identical; evidence of prior course of dealing might show a price below or above market price); *Weisberg v. Handy & Harman,* 747 F.2d 416, 421 (7th Cir.1984) (intention of the parties at time of contract was appropriate basis for § 2–305 "reasonable price"); *North Cent. Airlines, Inc. v. Continental Oil Co.,* 574 F.2d 582, 593 (D.C.Cir.1978) (case remanded to determine "reasonable price" taking into account parties' intention to pass through raw materials costs).

■ Applying these factors to the instant case is not an easy task as OTP and MPI operated in different markets with little overlap. MPI purchased its supply of phosphate rocks exclusively from Florida phosphate producers prior to receiving the November 1995 shipment of Togo phosphate rock. In contrast, OTP operated regularly in an international market, selling its phosphate rock to buyers in South America, Europe, the Far East, and two in North America.

In 1995, OTP generally sold its phosphate rock for $34 to $35 per metric ton,

---

7. Fla.Stat. § 672.305 is based upon section 2–305 of the Uniform Commercial Code. *Compare* Fla.Stat. § 672.305 *with* Uniform Commercial Code (U.L.A.) § 2–305 (1989).

plus shipping, with a discount for trial shipments for first-time customers of $6 per metric ton. It largest customer was Sherritt in Alberta, Canada.[8] Sherritt bought more than a million tons of Togo phosphate annually for which it paid approximately $32.00 per metric ton. It is not clear from the evidence whether this price included shipping or who paid for shipping.

OTP contends that MPI should pay $28.00 per metric ton, plus shipping, for the Togo rock. OTP's practice as a seller in the international market for phosphate rock was for the sales price to include the cost of shipping the phosphate rock. Adding the cost of freight ($14.50 per metric ton) to the purchase price of $28.00 per metric ton claimed by OTP results in a total price of $42.50 per metric ton.

On the other hand, MPI's practice, and the custom in the Florida phosphate industry, was for the supplier of phosphate rock to deliver it to the purchaser's plant, usually by railcar, where the purchaser was in the same general locale. The Florida phosphate rock which MPI purchased in 1995 included the delivery price. During that period, MPI paid from $26 to $27 per "short ton" for Florida phosphate delivered to its Mulberry plant.[9]

OTP and MPI had no prior course of dealing regarding the sale of Togo rock, but they were generally familiar with each other's markets for the sale and purchase of phosphate rock, due to the close ties between Glikou of OTP and Azuelos of MPI. Although OTP issued MPI a pro forma invoice for the shipment of Togo phosphate in November to meet the requirements of the U.S. Customs Service, they never agreed on a price for the shipment.

The official comment to Fla.Stat. § 672.305 suggests that "reasonable price" should be construed as the market value or reasonable value of the goods. *See* Florida Code Comment to Fla.Stat. § 672.305. However, the comment provides no guidance where the buyer and seller conduct business in two distinct markets. There are no reported Florida decisions on this issue.[10]

In such circumstances, it appears most appropriate to look to the prevailing price in the market where the seller has contracted to sell the rock. *See* White & Summers, *supra,* § 3–8, at 150 n. 15 (" § 2–305 says 'at the time for delivery.' Presumably this also means at the place for delivery.").[11] *See generally D.R. Cur-*

**8.** OTP also mentioned another North American client, Arcadian, to whom it sold phosphate rock in 1997. Arcadian is located in the Gulf of Mexico region on the Mississippi River. OTP's pricing arrangement with Arcadian is not clear from the record.

**9.** The testimony at trial indicated that a "short ton" is about ten percent (10%) less than a metric ton. According to *Black's Law Dictionary,* a short ton weighs 2,000 pounds and is equivalent to 0.907 metric tons. *See Black's Law Dictionary* 1334 (5th ed.1979). Stated another way, a short ton is equivalent to 2,000 pounds and a metric ton contains 2,205 pounds. This calculation is reinforced by the testimony of plaintiff's expert, Stephen Neas, who also stated that a metric ton is equivalent to 2,205 pounds.

**10.** The Comment accompanying the code cites *Lyng v. Bugbee Distrib. Co.,* 133 Fla. 419, 182 So. 801 (1938), for the proposition that "reasonable price" should be construed as the

market value or reasonable value of the goods. *See* Florida Code Comment to Fla. Stat. § 672.305. However, it appears that *Lyng* does not stand for the proposition cited in the official comment. Although *Lyng* generally concerns the issue of a missing price term, the Supreme Court of Florida held that the trial court erred in supplying the missing price term as the evidence showed that the parties had reached an explicit agreement on the price term. *See id.* at 803.

**11.** However, market price may not be a reliable indicator of reasonable price where the goods or services sold in a particular market are somewhat dissimilar. *See Spartan Grain & Mill Co. v. Ayers,* 517 F.2d 214, 217 (5th Cir.1975). In *Ayers,* the Fifth Circuit, construing Georgia's gap filling statute, affirmed that a buyer could not establish that the price charged for chicken feed was unreasonably high by comparing the seller's price to the prices charge by other chicken feed mer-

*tis, Co. v. Mathews,* 103 Idaho 776, 653 P.2d 1188, 1191 (Ct.App.1982) (where the parties left open an essential component of the price term, the value of the missing component was determined by looking to the market where the parties had contracted for the goods to be sold).[12]

OTP sold MPI 22,500 metric tons of Togo phosphate for use at MPI's Mulberry, Florida plant. According to OTP's November 10, 1995 "pro forma invoice," 168.75 of the 22,500 metric tons of Togo phosphate were lost due to wastage, leaving a net amount of 22,331.25 metric tons of phosphate delivered to MPI.

The BPL content of Florida rock (68 BPL) was, on the average, 12 points lower than Togo phosphate (80 BPL). Stephen Neas, a chemical engineer familiar with the phosphate industry who was called as a witness by OTP, testified that the market price of phosphate rock is adjusted upwards about \$.50 a ton per BPL level. Applying central Florida prices, MPI would have paid about \$6.00 per ton extra for the enhanced BPL level of Togo phosphate or about \$32 to \$33 per short ton.

Therefore, this court finds that a reasonable price for the shipment of Togo phosphate rock is the market price for a shipment of phosphate rock in the central Florida locale in 1995 adjusted for the enhanced BPL content of the Togo rock and converting the metric tons to short tons.

The 22,331.25 metric tons of phosphate that OTP sold to MPI is equivalent to approximately 24,609.18 short tons. At a price of \$33 per short ton, the shipment would be worth approximately \$812,100 in the central Florida market. At a price of \$32 per short ton, the shipment would be worth approximately \$787,500 in the central Florida market.

Recognizing that central Florida suppliers delivered the phosphate to MPI's Mulberry plant and that MPI took delivery of the Togo rock at the Port of Tampa and had to pay the transportation costs to its plant, the court finds that \$787,500 is the reasonable price of the Togo phosphate rock which was sold to MPI by OTP in November 1995.[13] Additionally, a price of \$32 per metric ton is roughly the middle of the range of prices proposed by the parties during their negotiations in late 1995 and early 1996: \$20 per metric ton (MPI) and \$42.50 per metric ton (OTP). *See generally Oglebay Norton Co. v. Armco, Inc.,* 52 Ohio St.3d 232, 556 N.E.2d 515, 519–20 (1990) (affirming trial court's determination of reasonable price term because the price term "fell acceptably between the [contract] rate range extremes proven at trial").

chants because "the products offered by the other [merchants] were simply not similar enough to [the seller's] package of feed and services to be used for comparative purposes." *Id.* at 217. This is not the case here. Although Togo phosphate commands a higher price due to its higher BPL content, the market is able to quantify these differences, as the evidence showed.

12. Two law review articles emphasize, without citing any case authority, the court's discretion in determining a reasonable price term. *See* Christian Paul Callens, Comment, *Louisiana Civil Law and the Uniform Commercial Code,* 69 Tul.L.Rev. 1649, 1681 (1995) (court is "free to consider all relevant markets" in deriving reasonable price term); J. Clark Kelso, Note, *The United Nations Convention on Contracts for the International Sale*

*of Goods,* 21 Colum.J. Transnat'l L. 529, 536 n. 43 (1983) (court may consider anyone of the following in determining a reasonable price term, including: the prevailing market price, the price ordinarily charged by seller, or the price ordinarily paid by buyer, or "some average of the above" in determining reasonable price).

13. The record does not disclose what portion of the \$26 to \$27 per short ton price for central Florida phosphate was attributable to shipping the rock from the seller to MPI's Mulberry plant. Allowing an offset for MPI's transportation costs of \$97,881.39 is not reasonable. Nor is it reasonable to award OTP its invoice price which includes shipping because that price (\$42.50 per metric ton) is substantially greater than the prevailing central Florida market prices for phosphate rock.

### Prejudgment Interest

■ OTP and MPI disagree as to OTP's right to prejudgment interest on OTP's breach of contract claim.[14] This issue is governed by Florida law.

■ "Under Florida law, when a verdict liquidates damages or a plaintiff's out-of-pocket pecuniary losses, that plaintiff is entitled as a matter of law to prejudgment interest at the statutory rate from the date of that loss." *Air Prods. and Chems., Inc. v. Louisiana Land and Exploration Co.*, 867 F.2d 1376, 1380 (11th Cir.1989) (citing *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So.2d 212, 215 (Fla.1985)). "[N]either the merit of the defense nor the certainty of the loss affects the award of prejudgment interest." *Id.* (citing *Argonaut*, 474 So.2d at 215). The key to the calculation of prejudgment interest is the date of the loss. *Id.* at 1381. The only cases exempt from this rule are damages for intangible losses.

The parties have not cited, and the court has not located, any case construing Florida law on the issue of whether prejudgment interest is available in a breach of contract action arising under Florida's gap-filling statutes, Fla.Stat. §§ 672.204(3), 672.305 where the parties do not agree as to the price of goods sold.

At closing argument, MPI argued that prejudgment interest is unavailable where the court must fill the gap as to a reasonable price because the amount due does not become a liquidated sum until that point.

MPI cites a Kansas case, *Arrowhead Constr. Co. of Dodge City, Kan., Inc. v. Essex Corp.*, 233 Kan. 241, 662 P.2d 1195 (1983), in support of its position. In the *Essex* case, the court relied on a gap-filling provision to determine the reasonable price for work performed by a sub-

contractor. *Id.* at 1202. The defendant had disputed that a contract existed or that, if so, that the price sought by plaintiff was reasonable. The trial court denied prejudgment interest and the appellate court affirmed. Citing the Kansas rule on prejudgment interest in a breach of contract action, the appellate court affirmed the denial of prejudgment interest. *Id.* at 1203.

■ As plaintiff points out, however, the Kansas prejudgment interest rule cited in *Essex* differs from the rule adopted by the Florida Supreme Court in *Argonaut*. Under Kansas law, "[w]here an amount is due upon contract, either expressed or implied, and there is no uncertainty as to the amount which is due or the date on which it becomes due, the creditor is entitled to recover interest from the due date." *Essex*, 662 P.2d at 1203 (citing *First Nat'l Bank of Girard v. Bankers Dispatch Corp.*, 221 Kan. 528, 562 P.2d 32, 40 (1977)).

■ However, the Florida prejudgment interest rule enunciated in *Argonaut* appears more expansive than the Kansas rule. As the court observed in *Argonaut*, prejudgment interest has been justified under either one of two theories: the loss theory or the punishment theory. Whether an amount of damages is ascertainable prior to trial is not controlling under the loss theory which is the rule followed by Florida courts:

> ... [S]ince at least before the turn of the century, Florida has adopted the position that prejudgment interest is merely another element of pecuniary damages. [footnote omitted] While doing so, the Court recognized and rejected an alternative but traditional rationale— that prejudgment interest was to be awarded as a penalty [footnote omitted] for defendant's "wrongful" act of disput-

---

**14.** Although OTP asserts that MPI did not assert this as a disputed issue of law in the Pretrial Statement, the court finds that the reference to the entitlement and right to prejudgment interest, while listed as a disputed issue of fact rather than law, adequately preserved this issue. Additionally, OTP was permitted to file a post-trial memorandum of law in response to MPI's closing arguments on this issue.

ing a claim found to be just and owing. This view is still the rule of some jurisdictions. See, e.g., *Home Insurance Co. v. Olmstead,* 355 So.2d 310 (Miss.1978). The distinction between liquidated and unliquidated claims is closely linked to this "penalty theory" of prejudgment interest. To punish a defendant for failure to pay a sum which was not yet certain or which he disputed would be manifest injustice. But where the amount is certain and the defendant refuses to surrender it because of defenses determined to be meritless, the defendant may properly be punished for abuse of his privilege to litigate. Under the "loss theory," however, neither the merit of the defense nor the certainty of the amount of loss affects the award of prejudgment interest. Rather, the loss itself is a wrongful deprivation by the defendant of the plaintiff's property. Plaintiff is to be made whole from the date of the loss once a finder of fact has determined the amount of damages and defendant's liability therefor.

*Argonaut,* 474 So.2d at 214–215.

Kansas law appears to be in line with the "penalty" rationale for imposing prejudgment interest whereas Florida follows the "loss" rationale. Simply put, under Florida law as reflected in *Argonaut,* any lack of certainty about the amount of loss prior to trial does not preclude prejudgment interest once the date of loss is determined. Kansas law is to the contrary and therefore the *Essex* case is unpersuasive.

In addition, the facts of this case are arguably distinguishable from the situation presented in *Essex.* MPI never disputed that it owed OTP some sum of money, albeit under a joint venture theory where its expenses set-off the expenses incurred by OTP in providing the Togo phosphate.

Although this issue has apparently not been decided directly by any Florida court, this court concludes that, based on the rationale expressed in *Argonaut,* Florida law permits an award of prejudgment interest in a breach of contract case involving the gap-filling provisions of Fla.Stat. § 672.305.

■■■■ MPI also contends that it would be inequitable to award prejudgment interest to OTP. It is true that the right to prejudgment interest is not absolute and may depend on equitable considerations. *See, e.g., Broward County v. Finlayson,* 555 So.2d 1211, 1213 (Fla.1990). However, in this case the equities clearly lie with OTP. The other cases cited by MPI at closing argument are distinguishable for the reasons cited in plaintiff's post-trial memorandum of law.

MPI used and profited from the Togo rock which it ordered from OTP in September 1994. Despite acknowledging a duty to pay something to OTP for the phosphate rock, MPI paid nothing, litigated this case for almost two years, and advanced a theory of joint venture which is not supported by the preponderance of credible evidence. Under the circumstances of this case, there is nothing inequitable in requiring MPI to pay prejudgment interest on amount which the court finds to be the reasonable price for the Togo phosphate. This is so even though the price which the court has determined to be reasonable is substantially lower than what OTP claimed.

■■■■ The court, of course, must determine the date on which the loss occurred, which in a contract case is the date on which payment was due. *See, e.g., Air Prods. and Chems.,* 867 F.2d at 1381.

OTP's final demand for payment was made on February 27, 1996 and the court finds that OTP's loss occurred thirty days later when MPI failed to make payment. Under Fla.Stat. § 687.01 (1996), the prejudgment interest rate in effect on that date was 10% per annum.

Accordingly, OTP is awarded the sum of $787,500 on its breach of contract claim plus prejudgment interest from March 28, 1996 until the date of judgment at the rate

of 10% per annum. In addition, plaintiff is award postjudgment interest, calculated from the day on which judgment was entered, at a rate of 4.727 % per annum. *See* 28 U.S.C. § 1961(a). The counterclaim brought by Mulberry Phosphates, Inc. is dismissed.

### Notice of Attorneys' Charging Lien by Counsel for Plaintiff

On March 19, 1999, Robert D. Gatton, Esq., attorney for plaintiff, filed a Notice of Attorneys' Charging Lien, Request for Resignation [sic] of Jurisdiction to Adjudicate Lien, and Memorandum in Support Thereof (Dkt.120). The Notice states that plaintiff entered into a written fee agreement with the law firm of Broad and Cassel on March 3, 1997 and that pursuant to this agreement plaintiff agreed to pay the firm "customary hourly rates of its attorneys for services rendered." In addition, counsel notes that the fee agreement provided that the law firm of Broad and Cassel could assert a charging lien against sums recovered by plaintiff as a result of its claims in this case. The Notice advises the court and opposing counsel that Broad and Cassel is asserting a charging lien in excess of $75,000 and requests that defendant refrain from paying plaintiff any part of the judgment entered by the Clerk, pursuant to the order of this court, until defendant confirms that the law firm of Broad and Cassel has been compensated for its services.

■ A charging lien secures an attorney's equitable right to have costs and fees for services rendered in the suit paid to him from the judgment or recovery in that particular suit. *See Sinclair, Louis, Siegel, Heath, Nussbaum & Zavertnik, P.A. v. Baucom,* 428 So.2d 1383, 1384 (Fla. 1983). Accordingly, this court reserves jurisdiction to adjudicate the charging lien. *See Newton v. Kiefer,* 547 So.2d 727 (Fla. 2d DCA 1989); *Wolfe v. Wolfe,* 540 So.2d 901 (Fla. 4th DCA 1989).

The Clerk of Court is directed to enter judgment in favor of plaintiff Offices Togolais des Phosphates and against defendant Mulberry Phosphates Inc., consistent with this decision.

**DONE** and **ORDERED.**

### *ORDER*

THIS CAUSE comes before the court for consideration of Defendant's Motion to Alter or Amend Judgment and Memorandum of Law in Support (Dkt.126), and defendant's response (Dkt.131).[1]

#### *Plaintiff's Rule 59(e) motion*

On May 19, 1999, this court entered its Findings of Fact and Conclusions of Law (Dkt.121) granting judgment for plaintiff on its breach of contract claim in the amount of $787,500 plus prejudgment interest at a rate of 10% per annum and postjudgment interest at a rate of 4.727% per annum. The order also dismissed defendant's counterclaim for breach of joint venture agreement.

Defendant now asks the court to reconsider its ruling on two issues. First, defendant contends that the court erred when it based the central Florida market value for the November 1995 shipment of Togo rock on the average BPL values for Togo phosphate (80 BPL) and Florida phosphate (68 BPL) instead of using the BPL content of rock actually delivered by OTP, which defendant asserts was actually about 78 BPL. Second, defendant argues that the court erred when it chose not to subtract out shipping and storage costs in calculating the value of Togo rock sold in the central Florida market. Although defendant maintains that the court decided correctly that the reasonable price for the shipment of the Togo rock is the price in the central Florida market, defendant argues that this conclusion dictates that the court should have adjusted the central Florida market price to reflect the cost of delivery to defendant's Mulberry, Florida

1. The parties have consented to proceed before the Magistrate Judge pursuant to Title 28, United States Code, Section 636(c) and Fed.R.Civ.P. 73.

plant, not the Port of Tampa. Accordingly, defendant maintains that the court should have taken into account the $270,983 that defendant paid to store the phosphate rock in Tampa and move it from the Port of Tampa to Mulberry.

In response, plaintiff points out that defendant itself cited the average BPL value for Togo phosphate when it proposed an appropriate price for the shipment of Togo rock in a December 1995 letter to OTP. Plaintiff further argues that the evidence introduced at trial shows that the average BPL range for Togo rock is between 78 and 80 and that the 80 BPL figure used by the court falls within that range.

Plaintiff also contends that the court acted within its discretion when it determined that the reasonable price for Togo phosphate sold in the central Florida market should not include defendant's shipping costs from the Port of Tampa to Mulberry.

### Rule 59(e) Standard

▮▮▮ There are three grounds that justify granting a motion to alter or amend judgment: 1) an intervening change in controlling law; 2) the availability of new evidence; or 3) the need to correct clear error or prevent manifest injustice. *See CSX Transp., Inc., v. City of Pensacola, Fla.*, 936 F.Supp. 885, 889 n. 2 (N.D.Fla. 1995); *Sussman v. Salem, Saxon & Nielsen, P.A.*, 153 F.R.D. 689, 694 (M.D.Fla. 1994). Rule 59(e), Fed.R.Civ.P., gives the court broad discretion to reconsider an order which it has entered. *See generally Wendy's Int'l, Inc. v. Nu–Cape Constr., Inc.*, 169 F.R.D. 680, 684 (M.D.Fla.1996); *Sussman*, 153 F.R.D. at 694 (citing *Mackin v. City of Boston*, 969 F.2d 1273, 1279 (1st Cir.1992), *cert. denied*, 506 U.S. 1078, 113 S.Ct. 1043, 122 L.Ed.2d 352 (1993)). "The decision of whether to grant or deny a Rule 59(e) motion is discretionary." *Wendy's Int'l, Inc.*, 169 F.R.D. at 684.

Plaintiff apparently relies on the third ground for relief as it does not argue an intervening change in law or the availability of new evidence.

### Discussion

It was not manifest error to calculate the central Florida market price for the Togo phosphate by using an average figure for the BPL content of Togo phosphate.

On December 19, 1995, Ekoue Glikou, OTP's managing director, transmitted a letter by facsimile to Judas Azuelos, Chairman of the Board of MPI, asking him to supply OTP with information from which it could calculate an appropriate invoice price for the November 1995 shipment of Togo phosphate. Specifically, Glikou asked Azuelos to provide OTP with "the price differential on BPL" between Togo and central Florida phosphate rock. *See* Translation of December 19, 1995 letter from Glikou to Azuelos.

On December 20, 1995, Robert C. Stewart, MPI's Senior Vice President for Operations & Administration responded to Glikou's letter. Stewart wrote that the average price for 68 BPL rock delivered to its Mulberry plant was $27.28 per metric ton. He further stated that "[u]sing this price and equating it to 80 BPL Togo rock, the equivalent would be … $32.09 per metric ton delivered to our plant." *See* December 20, 1995 letter from Stewart to Glikou.

▮▮▮ Defendant's letter, which was written one month after the shipment of Togo phosphate arrived in Tampa, establishes that a twelve point differential exists between Florida and Togo phosphate rock based on an 80 BPL value for Togo rock. As defendant considered the Togo phosphate to have a BPL value of 80 one month following the arrival of the shipment, it was not error, much less manifest error, for the court to use this value in calculating the reasonable price for Togo phosphate in the central Florida market in November 1995.

Furthermore, as noted in plaintiff's response to the instant motion, the 80 BPL value used by the court to established the market price of the Togo phosphate falls

within the range of BPL values for Togo rock which were introduced at trial.

 Nor was it manifest error for the court to exclude consideration of the full value of defendant's storage and shipping expenses, when calculating a reasonable price for the Togo phosphate in the central Florida market.

As an initial matter, the court reaffirms that it would have been **unreasonable** to offset defendant's storage expenses against the reasonable price for the shipment of phosphate rocks. Defendant incurred the cost of storing the phosphate rock at Port of Tampa because it apparently did not have the capability or the proper facilities to store the Togo phosphate. As defendant chose to store phosphate rock in Tampa for a period of time following the arrival of the shipment, those costs were properly excluded from calculation of the reasonable market price for Togo phosphate.

Nor did this court commit manifest error when it declined to credit defendant with the $ 97,881.39 in trucking expenses incurred in transporting the rock from Port of Tampa to Mulberry. As noted by plaintiff, defendant's transportation expenses were considered in determining the reasonable price of the Togo phosphate rock. The court recognized that central Florida phosphate producers deliver phosphate rock to the buyer's plant when it adopted a lower price of $32, instead of $33, per metric ton in establishing the value of a short ton of 80 BPL Togo phosphate rock.

Therefore, this court, exercising the discretion it is afforded for Rule 59(e) motions, will not revisit its findings as to the reasonable cost of Togo phosphate.

### Conclusion

Accordingly, it is, upon consideration, **ORDERED** that:

(1) Defendant's Motion to Alter or Amend Judgment (Dkt.126) is **DENIED**.

**DONE and ORDERED.**